**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AROLDO ALBERTO RODRIGUEZ DIAZ, | No. 20-16245 |
| *Petitioner-Appellee*, | D.C. No. 4:20-cv-01806-YGR |
| v. | OPINION |
| MERRICK B. GARLAND, Attorney General; CHAD F. WOLF, DAVID JENNINGS; WENDELL ANDERSON | |
| *Respondents-Appellants*. | |

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted December 7, 2021
Submission Vacated February 9, 2022
Resubmitted November 21, 2022
San Francisco, California

Before: Kim McLane Wardlaw, Daniel A. Bress, and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Bress;
Concurrence by Judge Bumatay;
Dissent by Judge Wardlaw

___

# SUMMARY[*]

___

### Immigration/Detention

Reversing a judgment of the district court that granted Aroldo Alberto Rodriguez Diaz's habeas petition challenging his continued immigration detention under 8 U.S.C. § 1226(a), and remanding, the panel held that due process does not require the agency to provide a second bond hearing at which the government bears the burden of proof by clear and convincing evidence.

After his release from incarceration, Rodriguez Diaz was detained pursuant to 8 U.S.C. § 1226(a), which allows the government to detain aliens pending a decision on whether the alien is to be removed. An Immigration Judge held a hearing and denied bond. Approximately 14 months later, Rodriguez Diaz requested a second bond hearing, but the IJ denied the motion, and Rodriguez Diaz appealed to the BIA. Before the BIA could rule, Rodriguez Diaz filed a habeas petition.

The district court granted Rodriguez Diaz's habeas petition in relevant part, ruling that he was constitutionally entitled to another bond hearing, and ordering that the hearing deviate from ordinary agency procedures, in that the government should bear the burden of proving by clear and convincing

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

evidence that he was a flight risk or a danger to the community. After such a hearing, the IJ granted bond and Rodriguez Diaz was released.

Before this court, Rodriguez Diaz claimed that due process requires the procedures that the district court imposed. The panel explained that this court previously applied the canon of constitutional avoidance to interpret other immigration provisions as providing a statutory right to a bond hearing once detention becomes prolonged. Having implied such a right, this court then concluded that, as a matter of due process, the government must bear the burden of proof in such hearings. However, in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the Supreme Court concluded that the requirements this court had imposed lacked any arguable statutory foundation and did not reach the constitutional issue.

The panel determined that prior precedent did not resolve Rodriguez Diaz's due process challenge. The panel also observed that the First and Second Circuits have held that the Due Process Clause entitles § 1226(a) detainees to an additional bond hearing after prolonged detention, while the Third and Fourth Circuits are on the other side of the question. Further, the panel explained that the Supreme Court has endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens. Because of this unique treatment of aliens, the government contended that the court should not apply the traditional three-factor balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Because the panel concluded that the Rodriguez Diaz's claims failed even under the *Mathews* test, which is presumably more favorable to him than the test the government sought, the panel assumed without deciding that *Mathews* applied here.

As to the first *Mathews* factor—the private interest affected by the official action—the panel concluded that this factor weighed in Rodriguez Diaz's favor. The panel assumed that Rodriguez Diaz's fourteen-month detention after his first bond hearing was "prolonged," explaining that this court has held that an individual's private interest in freedom from prolonged detention is unquestionably substantial, and observing that the government did not seriously dispute that Rodriguez Diaz had a legitimate and reasonably strong private liberty interest under *Mathews*.

Taking the third *Mathews* factor next—the government's interest—the panel concluded that the government clearly has a strong interest in preventing aliens from remaining in the country in violation of law. Because the enforcement of immigration law serves both a domestic law enforcement and foreign relations function, the Supreme Court has specifically instructed that courts must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature.

As to the second *Mathews* factor—the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards—the panel concluded that the existing procedures sufficiently protected Rodriguez Diaz's liberty interest and mitigated the risk of erroneous deprivation. The panel explained that the agency's detention decision was subject to numerous levels of review and that these procedures ensured that the risk of erroneous deprivation would be relatively small.

Accordingly, the panel held that § 1226(a)'s procedures satisfy due process, both facially and as applied to Rodriguez Diaz, and remanded for dismissal of the habeas petition.

Concurring, Judge Bumatay wrote that to the extent that the court's precedent required the panel to decide this case through the lens of *Mathews*, he fully joined the majority opinion. However, Judge Bumatay concluded that the case would be better decided through the text, structure, and history of the Constitution, rather than through interest balancing. Judge Bumatay concluded that under the original understanding of the Due Process Clause, Rodriguez Diaz's claim must fail; as a matter of text, structure, and history, Congress may authorize the government to detain removable aliens throughout their removal proceedings and nothing in the Due Process Clause requires individualized bond determinations beyond what Congress established in § 1226(a)—let alone under the heightened burden placed on the government by the district court here.

Dissenting, Judge Wardlaw wrote that she would affirm the district court. While Judge Wardlaw agreed that the *Mathews* test was the appropriate legal framework to apply, she could not agree with the majority's balancing of the *Mathews* factors. Observing that there was no question that the government has a strong interest, Judge Wardlaw wrote that the majority failed to account for the high risk of procedural error and the importance of Rodriguez Diaz's strong individual liberty interest. Explaining that this court's precedent instructs that Fifth Amendment procedural protections should be evaluated with even more scrutiny the longer an individual's liberty is deprived, Judge Wardlaw concluded that after six months, Rodriguez Diaz's liberty interest outweighed the government's interest, and the procedures afforded to him under § 1226(a) deprived him of his bodily liberty in violation of the Due Process Clause.

# COUNSEL

Sarah S. Wilson (argued), Senior Litigation Counsel; Ernesto Molina, Deputy Director; Jeffrey B. Clark, Acting Assistant Attorney General; Brian Boynton, Principal Deputy Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondents-Appellants.

Piper C. Akol (argued), Central American Resource Center of Northern California, San Francisco, California, for Petitioner-Appellee.

Kelsey A. Morales (argued), Raha Jorjani, and Evelyn Wise, Alameda County Public Defender's Office, Oakland, California, for Amici Curiae Alameda County Public Defender's Office, the Bronx Defenders, Brooklyn Defender Services, the Legal Aid Society, and the San Francisco Public Defender's Office.

Michael Kaufman and Liga Chia, ACLU Foundation of Southern California, Los Angeles, California; Judy Rabinovitz and Michael Tan, ACLU Immigrants' Rights Project, New York, New York; Ahilan Arulanantham, UCLA School of Law, Los Angeles, California; Jayashri Srikantiah, Stanford Law School Immigrants' Rights Clinic, Stanford, California; Sean Commons, Sidley Austin LLP, Los Angeles, California; for Amici Curiae ACLU Foundation and the ACLU Foundation of Southern California.

**OPINION**

BRESS, Circuit Judge:

Aroldo Rodriguez Diaz, a citizen of El Salvador, was detained pursuant to 8 U.S.C. § 1226(a), which authorizes the federal government to detain aliens pending the completion of their removal proceedings. In accordance with agency procedures, Rodriguez Diaz requested and received a bond hearing before an Immigration Judge (IJ) to determine if his detention was justified. The IJ concluded that Rodriguez Diaz, who had an extensive criminal history, presented a danger to the community due to his gang affiliation. Based on this, the IJ denied release on bond. Rodriguez Diaz now claims that his continued detention was unconstitutional because under the Due Process Clause of the Fifth Amendment, he is entitled to a second bond hearing at which the government bears the burden of proof by clear and convincing evidence.

We hold that in this case, due process does not require the procedures Rodriguez Diaz would have us impose. The detention of aliens during removal proceedings has long been upheld as a permissible exercise of the political branches' authority over immigration. Section 1226(a) offers substantial procedural protections to detained persons, and Rodriguez Diaz has not shown that these procedures violate due process, either facially or as applied. We therefore reverse the district court's contrary judgment and remand for dismissal of Rodriguez Diaz's habeas petition.

**I**

Rodriguez Diaz came to the United States from El Salvador as a child, entering this country illegally on a date and location unknown. On September 29, 2011, at age

fifteen, Rodriguez Diaz was convicted of first-degree residential burglary.  He spent about a month in state custody, after which he was transferred to Immigration and Customs Enforcement (ICE).

ICE initiated removal proceedings and charged Rodriguez Diaz with inadmissibility under 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without having been inspected, admitted, or paroled. Because Rodriguez Diaz was a minor, ICE transferred him to the custody of the Office of Refugee Resettlement, which subsequently released him on January 20, 2012.  Removal proceedings continued, and Rodriguez Diaz later filed applications for asylum and protection under the Convention Against Torture (CAT).

In the following years, Rodriguez Diaz accumulated a fairly lengthy criminal record.  In 2014, he was charged with battery on a person on school, park, or other property, and battery resulting in serious bodily injury.  These charges were later dismissed.  In 2016, Rodriguez Diaz was charged with misdemeanor possession of burglary tools.  While these charges were pending, he was also charged with possession of cocaine, to which he pleaded no contest in return for dismissal of the burglary tool charges.  For the drug charge, Rodriguez Diaz was sentenced to 18 months of probation. Finally, in 2018, Rodriguez Diaz was arrested on seven felony counts relating to a domestic dispute involving his wife and child.  He was convicted of spousal battery and intimidation of a witness, and was sentenced to 276 days in jail and 36 months of probation.  By this time, ICE had also received a report from local law enforcement that Rodriguez Diaz had admitted to being a gang member on two occasions.

On or about December 18, 2018, Rodriguez Diaz was

released from the San Mateo County Jail and taken into ICE custody pursuant to 8 U.S.C. § 1226(a), which allows the government to arrest and detain aliens "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Approximately two months later, on February 27, 2019, Rodriguez Diaz had a bond hearing before an IJ on the issue of whether his detention was justified because he presented a flight risk or a danger to the community. As permitted by agency regulations, Rodriguez Diaz was represented by counsel.

At the hearing, the IJ questioned Rodriguez Diaz about his alleged gang affiliation. Rodriguez Diaz testified under oath that he never belonged to a gang and that his tattoo, which read "C.L.," did not stand for the gang "Carnales Locos" but rather "California Life." The IJ did not find this testimony credible and denied bond on the ground that Rodriguez Diaz was a danger to the community based on his gang membership. Although Rodriguez Diaz could have appealed the IJ's decision to the Board of Immigration Appeals (BIA), he did not do so.

On May 13, 2019, the IJ denied Rodriguez Diaz's application for CAT relief and ordered him removed. Rodriguez Diaz appealed to the BIA, which dismissed his appeal in October 2019. Rodriguez Diaz then filed in this Court a petition for review of the BIA's decision. He also contemporaneously requested a temporary stay of removal, which we granted.

Meanwhile, on September 16, 2019, Rodriguez Diaz's conviction for drug possession was vacated. Rodriguez Diaz thereafter filed a motion to reopen his removal proceedings, arguing among other things that the vacatur of his conviction meant that he was newly eligible for cancellation of removal and adjustment of status. After the agency denied his motion

to reopen, Rodriguez Diaz filed a second petition for review in this Court. We consolidated this petition with Rodriguez Diaz's earlier petition for review concerning the denial of his CAT claim. Proceedings on the consolidated petitions remain ongoing in this Court and are not part of this case.[1]

Around this time, in February 2020, Rodriguez Diaz also filed a motion for a new bond and custody redetermination hearing before the IJ. As we will explain in greater detail, § 1226(a)'s implementing regulations allow detainees to seek an additional bond hearing before an IJ whenever they experience a material change in circumstances warranting a redetermination of custody status. *See* 8 C.F.R. § 1003.19(e). In his motion, Rodriguez Diaz claimed that the vacatur of his drug conviction and his efforts at rehabilitation constituted material changes in circumstances. Rodriguez Diaz admitted that he used to be a member of Carnales Locos but claimed he had cut ties with the gang.

The IJ denied the motion on February 24, 2020, finding that Rodriguez Diaz's representations about his gang affiliation were not credible given his prior false testimony on the matter, and that Rodriguez Diaz was therefore still a danger to the community. Thus, Rodriguez Diaz had not shown materially changed circumstances justifying a new bond hearing. On March 11, 2020, Rodriguez Diaz appealed the IJ's decision to the BIA.

---

[1] We are informed that Rodriguez Diaz's 2018 application for asylum remains pending with the U.S. Citizenship and Immigration Services (USCIS), which, under agency procedures for applications filed by unaccompanied minors, retains authority over the application despite the initiation of removal proceedings. At the time he sought asylum, Rodriguez Diaz was an unaccompanied minor.

Before the BIA could rule, however, Rodriguez Diaz filed a habeas petition in federal district court under 28 U.S.C. § 2241. In his petition, Rodriguez Diaz claimed that his detention was unconstitutionally prolonged and that he should at minimum receive a new bond hearing as a matter of due process, with the government bearing the burden of proof.

On April 27, 2020, the district court granted Rodriguez Diaz's habeas petition in relevant part. The district court ruled that Rodriguez Diaz was constitutionally entitled to another bond hearing before the IJ. The court further ordered that the hearing deviate from ordinary agency procedures, in that the government should bear the burden of proving by clear and convincing evidence that Rodriguez Diaz was a flight risk or a danger to the community.

In response to the district court's order, the IJ conducted a new hearing using the district court's prescribed procedures, after which the IJ granted Rodriguez Diaz bond in the amount of $10,000. Rodriguez Diaz posted bond on May 15, 2020, and he was released, having spent approximately a year and a half in immigration detention. The government timely appealed the district court's decision, which we review de novo. *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012).[2]

## II

Rodriguez Diaz's habeas petition emerges from a long line of circuit precedent addressing the process available to detained aliens, specifically, whether and when they are

---

[2] The government's compliance with the district court's order does not moot its appeal. *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1112–13 (9th Cir. 2012).

entitled to additional bond hearings and the procedures that should govern them. We previously applied the canon of constitutional avoidance to interpret other immigration provisions—8 U.S.C. §§ 1225(b),       1226(c),       and 1231(a)(6)—as providing a *statutory* right to a bond hearing once detention becomes prolonged. Having implied such a right, we then concluded that for these hearings to comply with due process, the government had to bear the burden of proving by clear and convincing evidence that the alien poses a flight risk or a danger to the community. *See Singh v. Holder*, 638 F.3d 1196, 1203–05 (9th Cir. 2011). Relying on these cases, Rodriguez Diaz argues (and the district court agreed) that he is entitled to *Singh*'s burden-shifting framework even though he is detained under a different statutory provision with its own procedural safeguards in place.

We disagree. Key aspects of our cases in this area are no longer good law, and regardless, they do not otherwise govern here. The Supreme Court has now twice overturned our decisions that invoked the canon of constitutional avoidance to interpret other immigration detention provisions as impliedly providing the right to a bond hearing. *Singh*'s holding about the appropriate procedures for those bond hearings—which also arose under different statutory provisions than the one here—was expressly premised on the (now incorrect) assumption that these hearings were statutorily authorized. *Singh* did not purport to establish a freestanding set of constitutionally mandated procedures that would apply to any detained alien. On the contrary, and as we will discuss, neither our Court nor the Supreme Court has ever directly addressed the type of constitutional challenge to alien detention bond procedures that we consider here—whether under § 1226(a) or otherwise.

Before we turn to the merits of Rodriguez Diaz's claim

that he is entitled to additional procedure under the Due Process Clause, we first explain why this question remains an open one.

**A**

We start with an overview of the statutory scheme governing immigration detention. This background is important in understanding both our precedents and the differences posed by detention under § 1226(a) as compared to other provisions.

The provision at issue in this case, 8 U.S.C. § 1226, provides the general process for arresting and detaining aliens who are present in the United States and eligible for removal. Section 1226 "distinguishes between two different categories of aliens." *Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018). Section 1226(a) establishes the "default rule," *id.*, giving the Attorney General "broad discretion" over detention matters, *Nielsen v. Preap*, 139 S. Ct. 954, 956 (2019). This provision authorizes the Attorney General, in his discretion, to arrest and detain aliens "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a).

For these individuals, the Attorney General can either "continue to detain the arrested alien," or "may release the alien on (A) bond of at least $1,500 . . . or (B) conditional parole." *Id.* § 1226(a)(1)–(2). When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination. 8 C.F.R. § 236.1(c)(8). The alien will be released if he "demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id.*

Section 1226(c), on the other hand, carves out a class of aliens for whom detention is mandatory. 8 U.S.C. § 1226(c). This includes individuals who have committed certain enumerated offenses or who have been involved in drug trafficking or terrorist activities. *Id.* § 1226(c)(1). ICE may only release a person detained pursuant to this provision if necessary for witness protection purposes. *Id.* § 1226(c)(2); *see also Jennings*, 138 S. Ct. at 838.

Sections 1226(a) and 1226(c) also differ as to the procedural protections afforded once an alien is already detained. Under § 1226(a) and its implementing regulations, a detainee may request a bond hearing before an IJ at any time before a removal order becomes final. *See* 8 C.F.R. §§ 236.1(d)(1), 1003.19. If at this hearing the detainee demonstrates by the preponderance of the evidence that he is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk," the IJ will order his release. *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006); *see also Matter of Barreiros*, 10 I. & N. Dec. 536, 537–38 (B.I.A. 1964). The IJ considers various factors in making this determination, including the individual's ties to the United States as well as his employment history, criminal record, history of immigration violations, and manner of entry into this country. *Matter of Guerra*, 24 I. & N. Dec. at 40. The IJ also decides whether bond or other conditions on the alien's release are appropriate. *Id.*; *see* 8 U.S.C. § 1226(a)(2). The detainee may be represented by counsel and can submit evidence in support of his claims. *See* 8 C.F.R. § 1003.19(b); *Matter of Fatahi*, 26 I. & N. Dec. 791, 792 (B.I.A. 2016). He can also appeal an adverse decision to the BIA. *See* 8 C.F.R. § 236.1(d)(3).

On top of this, an individual detained pursuant to § 1226(a) may request an additional bond hearing whenever

he experiences a material change in circumstances.  *See* 8 C.F.R. § 1003.19(e).  The same procedures apply to this new hearing, and its outcome is also appealable to the BIA.  *See generally id.* § 1003.19.  By contrast, § 1226(c) on its face offers no opportunity for release on bond.  *See* 8 U.S.C. § 1226(c); *Prieto-Romero v. Clark*, 534 F.3d 1053, 1066 (9th Cir. 2008).

Additional provisions supplement § 1226's detention scheme.  Section 1225(b) applies to an "applicant for admission," that is, "[a]n alien present in the United States who has not been admitted or who arrives in the United States."  8 U.S.C. § 1225(a)(1).  Under § 1225(b)(1), an applicant for admission "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation" is "normally ordered removed 'without further hearing or review' pursuant to an expedited removal process."  *Jennings*, 138 S. Ct. at 837 (quoting 8 U.S.C. § 1225(b)(1)(A)(i)).  But if the alien applies for asylum and has a credible fear of persecution, "the alien shall be detained for further consideration of the application."  8 U.S.C. § 1225(b)(1)(B)(ii).  All other applicants for admission are covered by § 1225(b)(2), which "serves as a catchall provision," *Jennings*, 138 S. Ct. at 837, and which mandates detention "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted," 8 U.S.C. § 1225(b)(2)(A).

Once an alien has a final removal order that is not subject to a judicial stay, detention authority shifts to 8 U.S.C. § 1231(a).  *See Jennings*, 138 S. Ct. at 843; *Diouf v. Napolitano*, 634 F.3d 1081, 1085 (9th Cir. 2011); 8 U.S.C. § 1231(a)(1)(B).  Section 1231(a) provides that "the Attorney General shall remove the alien from the United States within a period of 90 days."  8 U.S.C. § 1231(a)(1)(A).  "During the removal period, the Attorney

General shall detain the alien." *Id.* § 1231(a)(2). Certain individuals—such as those who are convicted criminals, terrorists, or who are otherwise "determined by the Attorney General to be a risk to the community or unlikely to comply with the order or removal"—"may be detained beyond the removal period." *Id.* § 1231(a)(6). Like § 1226(c), neither § 1225(b) nor § 1231(a) on their face provides for bond hearings. *See generally id.* §§ 1225(b), 1231(a)(2), 1231(a)(6).

**B**

We now turn to the case law on which Rodriguez Diaz relies. We conclude that our cases do not resolve Rodriguez Diaz's due process challenge to his detention under § 1226(a).

**1**

The relevant line of authority begins with *Zadvydas v. Davis*, 533 U.S. 678 (2001). There, the Supreme Court addressed whether § 1231(a)(6)'s language providing that certain aliens "may be detained beyond the removal period [of 90 days]" authorized indefinite detention. *Id.* at 682 (quoting 8 U.S.C. § 1231(a)(6)). Although the challengers raised both statutory and constitutional objections to the government's detention authority under this aspect of § 1231(a)(6), *Zadvydas* resolved only the former. *See id.* at 686, 689.

*Zadvydas* determined that the text of § 1231(a)(6) was unclear on the relevant question due to ambiguity in the word "may," but that the statute would raise "serious constitutional concerns" if it did indeed permit indefinite detention. *Id.* at 682, 697. The Court therefore applied the canon of constitutional avoidance to "construe the statute to

contain an implicit 'reasonable time' limitation." *Id.* at 682. The Court further concluded that a "reasonable time" would be six months: at this point, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the government must either rebut that showing or release the alien. *Id.* at 701.

A few years later, in *Casas-Castrillon v. DHS*, 535 F.3d 942 (9th Cir. 2008), we confronted a similar challenge to detention under § 1226(c). The petitioner, Casas, was a legal permanent resident who had been mandatorily detained under § 1226(c), and his detention continued for seven years without a bond hearing while he sought review of his removal order. *Id.* at 944–46. Eventually, Casas filed a habeas petition seeking "a meaningful opportunity to contest the necessity of continued detention." *Id.* at 945.

We acknowledged that the Supreme Court in *Demore v. Kim*, 538 U.S. 510 (2003), had previously upheld the constitutionality of mandatory detention under § 1226(c). *See Casas*, 535 F.3d at 949–50. But we reasoned that *Demore* had assumed that any detention period would be brief. *Id.* By contrast, unusually prolonged periods like Casas's raised "serious constitutional concerns." *Id.* at 950.

Relying on our earlier decision in *Tijani v. Willis*, 430 F.3d 1241 (9th Cir. 2005), we then applied the canon of constitutional avoidance to interpret § 1226(c) as ceasing to govern "upon the dismissal of the alien's appeal by the BIA," although notably, we reached no conclusion about the constitutionality of § 1226(c) absent this interpretation. *Casas*, 535 F.3d at 947–48; *see also id.* at 951. We concluded that once the BIA dismissed the alien's appeal, "detention authority shift[s] to § 1226(a)." *Id.* at 947. And relying again on the canon of constitutional avoidance, we

"h[e]ld that § 1226(a) must be construed as *requiring* the Attorney General to provide the alien with" a bond hearing. *Id.* at 951. This meant that Casas was now entitled to a bond hearing, like all § 1226(a) detainees. *Id.* at 951–52; *see also* 8 C.F.R. §§ 236.1(d)(1), 1003.19. We later extended our holding in *Casas* to any alien detained under § 1226(c) for more than six months, "[r]egardless of the stage of proceedings." *Rodriguez v. Robbins*, 715 F.3d 1127, 1138–39 (9th Cir. 2013) (quotations omitted).

Then, in *Diouf v. Napolitano*, 634 F.3d 1081 (9th Cir. 2011) (*Diouf II*), we "extend[ed]" the logic of *Casas* to individuals detained under § 1231(a)(6). *Id.* at 1084–86. Once again, we invoked the canon of constitutional avoidance to interpret § 1231(a)(6) as conferring the statutory right to a bond hearing. *Id.* at 1086. And once again, we did not reach the petitioner's constitutional claims. *Id.* We further clarified that "[a]s a general matter, detention is prolonged when it has lasted six months and is expected to continue more than minimally beyond six months." *Id.* at 1091–92 & n.13. It is therefore at this point that the statutorily implied bond hearing requirement kicks in, for persons detained initially under both § 1226(c) and § 1231(a)(6). *See id.*

Neither *Casas* nor *Diouf II* explained what procedures would apply to the bond hearings that we read into §§ 1226(c) and 1231(a)(6). We took up that question in *Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011), in which an alien detained without bond under § 1226(c) received a "*Casas* hearing" approximately 16 months after he was first detained. *See id.* at 1200–01; Brief for the Appellant, *Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011) (No. 10-15715), 2010 WL 5650042, at *6. In *Singh*, we held that "in *Casas* hearings, the government must prove by clear and convincing evidence that continued detention is justified"

based on the alien's flight risk or danger to the community. *Id.* at 1200; *see also id.* at 1205 ("We therefore hold that the clear and convincing evidence standard of proof applies in *Casas* bond hearings."). We based this conclusion on general principles of procedural due process, reasoning that a detained person's liberty interest is substantial. *Id.* at 1203–05.

In our next major set of cases in this line, we considered a class action brought on behalf of aliens who had been detained for over six months without a bond hearing under the various statutes we have discussed: §§ 1225(b), 1226(a), 1226(c), and 1231(a). *See Rodriguez v. Hayes*, 591 F.3d 1105, 1112 (9th Cir. 2010). After a long and complicated procedural history, the details of which are not necessary to our analysis, the district court entered a permanent injunction requiring individualized bond hearings for all class members. *See Rodriguez v. Robbins*, 804 F.3d 1060, 1065 (9th Cir. 2015) (*Rodriguez III*). Consistent with our decision in an earlier appeal in that litigation, *see Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) (*Rodriguez II*), the district court held that at these hearings, as in *Singh*, the government should bear the burden of proof by clear and convincing evidence. *Rodriguez III*, 804 F.3d at 1066; *see also Rodriguez II*, 715 F.3d at 1132–33 (holding that "based on our precedent, the canon of constitutional avoidance requires us to construe the government's statutory mandatory detention authority under Section 1226(c) and Section 1225(b) as limited to a six-month period, subject to a finding of flight risk or dangerousness").In *Rodriguez III*, we affirmed the district court's order with respect to those class members detained under §§ 1225(b), 1226(a), and

1226(c).[3]  *Id.* at 1078–85.  We explained that "based on our precedents," namely *Casas*, *Singh*, and *Diouf II*, "the canon of constitutional avoidance requires us to construe the statutory scheme to provide all class members who are in prolonged detention with bond hearings at which the government bears the burden of proving by clear and convincing evidence that the class member is a danger to the community or a flight risk."  *Id.* at 1074.  We acknowledged that detainees under § 1226(a) were already entitled to a bond hearing under the statute and implementing regulations, but we explained that these hearings needed to be provided automatically, as opposed to by request.  *Id.* at 1084–85.  And we further clarified that all class members were entitled to periodic bond hearings every six months, not just one hearing at the six-month mark.  *Id.* at 1089.

**2**

The Supreme Court's intervention would substantially upend the circuit precedent we have just discussed.  In *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the Supreme Court reversed our decision in *Rodriguez III*, and with it, some of the prior circuit precedent on which *Rodriguez III* was based.  Distinguishing *Zadvydas*, *Jennings* held that we misapplied the canon of constitutional avoidance because our interpretations of §§ 1225(b), 1226(a), and 1226(c) were not plausible, as the requirements of periodic bond hearings that we imposed lacked "any arguable statutory foundation."  *Id.* at 842–44.  The Court concluded that our interpretations of §§ 1225(b) and 1226(c) as ceasing to govern after six months were also not supported by the relevant provisions, and that those provisions in fact "authorize detention until

---

[3] We concluded that the § 1231(a) detainees were excluded from the class definition because they had already been ordered removed.  *Rodriguez III*, 804 F.3d at 1085–86.

the end of applicable proceedings," as opposed to under the authority of § 1226(a).  *Id.* at 842–43, 846.

As to § 1226(a), *Jennings* explained that "nothing in § 1226(a)'s text—which says only that the Attorney General 'may release' the alien 'on . . . bond'—even remotely supports the imposition" of "periodic bond hearings every six months in which the Attorney General must prove by clear and convincing evidence that the alien's continued detention is necessary."  *Id.* at 847.  Therefore, the canon of constitutional avoidance was inapposite because it "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."  *Id.* at 842 (quotations omitted).

The Supreme Court in *Jennings* did not reach the alleged unconstitutionality of immigration detention absent the procedural requirements we had read into the statute, and instead remanded for consideration of the constitutional question in the first instance.  *Id.* at 851.  We in turn remanded to the district court, which has not yet issued a decision.  *See Rodriguez v. Marin*, 909 F.3d 252, 255 (9th Cir. 2018); *Rodriguez v. Barr*, No. 20-55770, 2021 WL 4871067 (9th Cir. Oct. 19, 2021).

Following *Jennings*, we re-examined the applicable procedures for immigration detention under § 1231(a)(6).  In *Aleman Gonzalez v. Barr*, 955 F.3d 762 (9th Cir. 2020), we concluded that the procedural requirements imposed by *Singh* and *Diouf II* on § 1231(a)(6) detention remained intact, notwithstanding *Jennings*.  *See id.* at 765–66.  We reasoned that *Jennings* addressed different statutory provisions—§§ 1225(b), 1226(a), and 1226(c)—and thus did not preclude reading procedural requirements into § 1231(a)(6) as a matter of statutory interpretation, using the doctrine of constitutional avoidance.  *Id.* at 777–78.  We also

explained that *Singh* was decided on constitutional grounds, and that *Jennings* explicitly left open any constitutional questions that prolonged immigration detention may pose. *Id.* at 781. We thus believed that *Diouf II* was not clearly irreconcilable with *Jennings*, so that we were required to follow it as a matter of binding circuit precedent when it came to § 1231(a)(6). *Id.* at 765–66.

The Supreme Court again reversed, holding that under 8 U.S.C. § 1252(f)(1), the district court lacked jurisdiction to issue the requested class-wide injunctive relief. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2062–63 (2022). In a companion case decided that same day arising from the Third Circuit, *Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827 (2022), the Supreme Court separately rejected our statutory interpretation in *Aleman Gonzalez* (which was itself based on *Diouf II*). *Arteaga-Martinez* held that "there is no plausible construction of the text of § 1231(a)(6) that requires the Government to provide bond hearings before immigration judges after six months of detention, with the Government bearing the burden of proving by clear and convincing evidence," and that the statute "does not address or even hint at the requirements imposed below." *Id.* at 1833 (quotations and alterations omitted). As in *Jennings*, however, the Court declined to resolve in the first instance any constitutional challenges to the continued detention. *Id.* at 1834–35.

Most recently, in *Avilez v. Garland*, 48 F.4th 915 (9th Cir. 2022), we revisited our holding in *Casas-Castrillon* that aliens who are detained under § 1226(c) become detained under § 1226(a) once the BIA issues a final order of removal and the alien files a petition for review in federal court. We recognized that under the Supreme Court's intervening decision in *Jennings*, §§ 1226(a) and (c) "apply to discrete categories of noncitizens—and *not* to different stages of a

noncitizen's legal proceedings." *Id.* at 923. Thus, *Jennings* was "clearly irreconcilable with *Casas-Castrillon*'s conclusion that a [§ 1226(c)] detainee who pursues judicial review of an order of removal is detained first under [§ 1226(c)] and later under [§ 1226(a)]." *Id.* at 925.

This meant that under circuit precedent, *see Prieto-Romero*, 534 F.3d at 1062, an alien detained under § 1226(c) was subject to that detention authority throughout the administrative and judicial phases of her removal proceedings, and was therefore not entitled to a bond hearing under § 1226(c) as a statutory matter. *Avilez*, 48 F.4th, at 925–27. But we remanded the case for the district court to consider the petitioner's argument that she was entitled to a bond hearing as a matter of due process. *Id.* at 927.

## C

Our tour through these cases shows they do not resolve Rodriguez Diaz's procedural due process challenge to his detention under § 1226(a). This is so for several reasons.

Most obviously, after the Supreme Court's decisions in *Jennings* and *Arteaga-Martinez*, it remains undetermined whether the Due Process Clause requires additional bond procedures under *any* immigration detention statute. Although we previously concluded that bond hearings and certain procedures were statutorily required under §§ 1225(b), 1226(c), and 1231(a)(6) based on the doctrine of constitutional avoidance, the Supreme Court has since held that none of these rights exist as a statutory matter. *Jennings*, 138 S. Ct. at 836; *Arteaga-Martinez*, 142 S. Ct. at 1830. And although we read certain procedures into § 1226(a) as a matter of constitutional avoidance, *see Rodriguez III*, 804 F.3d at 1085, the Supreme Court disagreed with that, too, *see Jennings*, 138 S. Ct. at 847–48.

Thus, although *Singh* relied on the Due Process Clause in determining the procedural rights available to alien detainees, it did so in service of an implied statutory right to a bond hearing for persons detained under § 1226(c)—an implied right that the Supreme Court has now rejected. *Jennings*, 138 S. Ct. at 836. Because *Singh* "specifie[d] the appropriate standard of proof" for the bond hearings arising from § 1226(c) detentions that we (erroneously) believed were statutorily required, we have not addressed the potential applicability, if any, of *Singh*'s holding absent that perceived statutory right (and we have no occasion to do so in this case outside of § 1226(a)). *See Singh*, 638 F.3d at 1203.[4]

To the extent that any parts of *Singh*, *Casas*, *Diouf II*, and *Rodriguez II* remain good law—an issue we need not decide—those cases in relevant part addressed detention under §§ 1225(b), 1226(c), or 1231(a)(6), not detention that was based on § 1226(a) throughout. Here, we deal with § 1226(a), which is challenged on constitutional grounds. Once again, we have never addressed the constitutionality of the detailed procedures in § 1226(a) and its implementing regulations.

As our own precedents demonstrate, § 1226(a) stands out from the other immigration detention provisions in key respects. Section 1226(a) and its implementing regulations

---

[4] It is apparent that between *Jennings* and *Arteaga-Martinez*, various past cases of ours (and statements in past cases) are no longer good law. We do not purport to offer a final accounting on that score for matters that are beyond the scope of this opinion. Thus, and by way of minor clarification with the dissenting opinion, we have no occasion to decide whether *Singh* remains good law in any respect following *Jennings*.

provide extensive procedural protections that are unavailable under other detention provisions, including several layers of review of the agency's initial custody determination, an initial bond hearing before a neutral decisionmaker, the opportunity to be represented by counsel and to present evidence, the right to appeal, and the right to seek a new hearing when circumstances materially change. *See generally* 8 U.S.C. § 1226(a)(1)–(2); 8 C.F.R. §§ 236.1, 1003.19.

Indeed, while our past precedents mandated certain procedures for detainees under §§ 1225(b), 1226(c), and 1231(a)(6) as a matter of constitutional avoidance, the holdings of those cases were premised on the lack of process that was afforded to those aliens *as compared to § 1226(a) detainees*. *See Casas*, 535 F.3d at 951–52 (observing that § 1226(c) "falls far short of the procedural protections afforded in ordinary bond hearings, where aliens may contest the necessity of their detention before an immigration judge and have an opportunity to appeal that determination"); *Diouf II*, 634 F.3d at 1088 (holding that the government's interests "do not warrant categorically denying to § 1231(a)(6) detainees the right to a bond hearing that § 1226(a) detainees already enjoy"); *see also Prieto-Romero*, 534 F.3d at 1066 (distinguishing aliens detained under §§ 1226(a) and 1226(c) because the latter "never received *any* individualized bond determination").

Consistent with that observation, we in fact cited § 1226(a)'s procedures as a reference point for what we believed should be required under these other statutory provisions. *See Diouf II*, 634 F.3d at 1084 ("We hold that individuals detained under § 1231(a)(6) are entitled to the same procedural safeguards against prolonged detention as individuals detained under § 1226(a)."); *Casas*, 535 F.3d at 948 (explaining that once Casas had a removal order,

detention authority "shifted instead to § 1226(a)" and thus entitled him to a bond hearing); *Rodriguez II*, 715 F.3d at 1144 (same for § 1225(b) detainees).

For all these reasons, prior precedent does not resolve the due process challenge to § 1226(a) that Rodriguez Diaz asserts here. Both our Court and the Supreme Court have repeatedly declined to decide constitutional challenges to bond hearing procedures in the immigration detention context, whether the claims were brought by an alien held under § 1226(a) or another provision. We have never held that *Singh* provided the constitutional baseline for persons like Rodriguez Diaz, who were never mandatorily detained and who have been subject to § 1226(a) and its implementing regulations throughout their detention. And § 1226(a) provides substantially different procedures than the provisions we have examined in the past. We therefore cannot accept Rodriguez Diaz's suggestion that *Casas* and *Singh* mandate the same procedural relief in this case.

## III

Unencumbered by binding circuit precedent, we now address head-on the question presented in this case: does the Due Process Clause entitle Rodriguez Diaz to a second bond hearing at which the government bears the burden of proof by clear and convincing evidence? We hold that the Due Process Clause does not so require.

As a threshold issue, we note some ambiguity about the precise nature of Rodriguez Diaz's claims, in that it is unclear whether Rodriguez Diaz challenges § 1226(a)'s procedures facially, as applied, or both. A facial challenge is "a claim that the legislature has violated the Constitution," meaning that "the plaintiff must show that 'no set of circumstances exists under which the statute would be

valid.'"  *Young v. Hawaii*, 992 F.3d 765, 779 (9th Cir. 2021) (quoting *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971 (9th Cir. 2003)) (alterations omitted).  An as-applied challenge, meanwhile, "focuses on the statute's application to the plaintiff," and requires the court to only assess the circumstances of the case at hand.  *Wells Fargo Bank, N.A. v. Mahogany Meadows Ave. Tr.*, 979 F.3d 1209, 1217 (9th Cir. 2020).

At oral argument, Rodriguez Diaz clarified that he is seeking a ruling that would mandate bond hearings for all aliens detained under § 1226(a) for a "prolonged" period. With that, he seemingly forgoes a challenge to the validity of the procedures as applied to shorter detention periods, and thus disclaims a true facial challenge.  *See Young*, 992 F.3d at 779.  But other aspects of his argument would appear to require across-the-board changes to the procedures that govern § 1226(a) detentions, and are in that way reminiscent of a broader, facial-type challenge.  And Rodriguez Diaz did state in his brief that "[t]he current framework procedures are unlawful for any length of detention," which is again indicative of a facial challenge.  We conclude that Rodriguez Diaz's claims fail whether construed as facial or as-applied challenges to § 1226(a).

## A

We begin with an overview of how other courts have approached this issue.  Although our circuit has yet to address this type of challenge (as we explained above), other circuits have broached the issue.  And they have divided over the constitutionality of § 1226(a)'s procedures.

The First and Second Circuits have held that the Due Process Clause entitles § 1226(a) detainees to an additional bond hearing after prolonged periods of detention.

However, the facts on which those courts reached their conclusions differed, as do their holdings regarding the procedures the agency must follow in these hearings.

In *Hernandez-Lara v. Lyons*, 10 F.4th 19 (1st Cir. 2021), the First Circuit considered a habeas petition brought by an alien who had been detained under § 1226(a) for approximately ten months, and who had received a bond hearing one month into her detention. *Id.* at 24–26. Over a vigorous dissent by Judge Lynch, the majority concluded that § 1226(a)'s procedures were invalid as applied to all aliens subject to "prolonged" detention. *Id.* at 30, 39–41. Applying the balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), the First Circuit concluded that Hernandez's liberty interest was significant; the current procedures created an unacceptable risk of error; and the government's proffered interest, although "legitimate," was outweighed by the private interest. *Id.* at 28–33.

The First Circuit held that the proper remedy was a new bond hearing at which the government would bear the burden of proof. *Id.* at 39–41. Specifically, the government would need to prove by clear and convincing evidence that the alien was a danger to the community, but need only prove by a preponderance of the evidence that she was a flight risk. *Id.* at 40. The reason for this difference in standards of proof, the court explained, is that there is "less risk of error" regarding flight risk because detainees "possess knowledge of many of the most relevant factors," whereas "the government has ample and better access to evidence of dangerousness." *Id.* However, the court declined to decide when detention became sufficiently "prolonged" to require this remedy. *Id.* at 30 n.4.

Judge Lynch forcefully dissented on the due process question. She maintained that "[t]he current procedures

provide detained noncitizens constitutionally sufficient notice and opportunity to be heard," and that the majority was "arrogat[ing] to the judiciary control over immigration bond procedures." *Id.* at 53–54, 57 (Lynch, J., dissenting); *see also id.* at 55 ("[T]he majority's due process analysis is contrary to Supreme Court precedent, contrary to precedent from other circuits, and wrong.").

The Second Circuit, too, concluded that § 1226(a)'s procedures were constitutionally inadequate as applied to the alien in that case. *See Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020). Velasco Lopez had been detained for fifteen months under § 1226(a) while criminal proceedings against him were ongoing, and had received a bond hearing after three and a half months of detention. *Id.* at 846–47. But notably, the government's conduct in *Velasco Lopez* presented some unique circumstances. In *Velasco Lopez*, ICE refused to produce the alien for his court appearances and, as a result, his criminal case could not progress. *Id.* at 852–53. But despite the agency's role in delaying the dismissal of the charges (which eventually occurred months later), Velasco Lopez was denied bond because of the pending charges. *Id.* Velasco Lopez also "struggled to obtain" key records relating to his case that were in the government's possession, and ultimately had to resort to filing a Freedom of Information Act request. *Id.* at 853 & n.9.

The Second Circuit applied *Mathews* in a similar manner as the First Circuit and held that once detention under § 1226(a) became "prolonged," a detainee was entitled to a new bond hearing at which the government bore the burden of proof by clear and convincing evidence. *Id.* at 853–56. The Second Circuit likewise declined to "establish a bright-line rule" for when due process required these additional procedures. *Id.* at 855 n.13.

On the other side of the question are the Third and Fourth Circuits.  The Third Circuit rejected a § 1226(a) detainee's request for a new bond hearing with a shifted burden after the alien had been detained for fourteen months following his initial bond hearing.  *Borbot v. Warden Hudson Cnty. Corr. Facility*, 906 F.3d 274, 275–77 (3d Cir. 2018).  According to the Third Circuit, Borbot did not challenge his first bond hearing, and "Borbot cites no authority, and we can find none, to suggest that duration alone can sustain a due process challenge by a detainee who has been afforded the process contemplated by § 1226(a) and its implementing regulations."  *Id.* at 277.

The Third Circuit also rejected Borbot's argument that his situation was analogous to that of an alien subject to prolonged mandatory detention under § 1226(c), who, under Third Circuit precedent, was constitutionally entitled to "a hearing[] at which the Government bears the burden of proving that continued detention is necessary."  *Id.* at 277–78 (quoting *Diop v. ICE*, 656 F.3d 221, 233 (3d Cir. 2011)).  The court explained that the holdings of those § 1226(c) cases were "inappropriate in the context of § 1226(a)," which already afforded Borbot a "prompt bond hearing" and "an opportunity to obtain a redetermination hearing if he could show materially changed circumstances."  *Id.* at 278.  Thus, the court reasoned, "Borbot was granted meaningful process prior to filing his habeas petition," and due process did not require anything further.  *Id.* at 279.[5]

---

[5] The dissent's reliance on *German Santos v. Warden Pike County Correctional Facility*. 965 F.3d 203 (3d Cir. 2020), is misplaced.  That case involved an alien who was detained for over two and a half years under *§ 1226(c)*, which, as we

The Fourth Circuit agrees with the Third Circuit. *See Miranda v. Garland*, 34 F.4th 338, 358 (4th Cir. 2022). Applying *Mathews*, the court reasoned that, *first*, aliens are "due less process when facing removal hearings than an ordinary citizen." *Id.* at 359. *Second*, § 1226(a) detainees "already receive the fundamental features of due process— notice and an opportunity to be heard." *Id.* at 362. And *third*, the government has a "vital public interest" in enforcing immigration laws, which is facilitated by detention during removal proceedings. *Id.* at 364. Thus, § 1226(a)'s procedures "do not violate the Constitution's Due Process Clause." *Id.* at 365.[6]

As we will now explain, we find the reasoning of the Third and Fourth Circuits and Judge Lynch's dissent most consistent with the principles and precedents governing the constitutionality of immigration detention.

---

have discussed, provides no statutory right to a bond hearing. It was on this same basis that the Third Circuit in *Borbot* distinguished its § 1226(c) line of cases. *See Borbot*, 906 F.3d at 278–79 ("Unlike § 1226(c) detainees . . . who were detained for prolonged periods of time without being given any opportunity to apply for release on bond, Borbot was granted meaningful process prior to filing his habeas petition.").

[6] In addition, in an unpublished decision, the Eighth Circuit expressed "skeptic[ism]" that an alien's "detention pending a decision on whether he is to be removed under § 1226(a) is unconstitutional considering he was given a bond hearing and still has available procedural avenues to seek relief." *Ali v. Brott*, 770 F. App'x 298, 301 (8th Cir. 2019). The Eighth Circuit noted that "Supreme Court precedent indicates such a framework is constitutionally permissible." *Id.*

**B**

"The Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Hussain v. Rosen*, 985 F.3d 634, 642 (9th Cir. 2021) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)) (alterations omitted). At the same time, we interpret the Due Process Clause consistent with longstanding precedent recognizing that the process due aliens must account for the government's countervailing interests in immigration enforcement—considerations that do not apply to U.S. citizens.

The recognized liberty interests of U.S. citizens and aliens are not coextensive: the Supreme Court has "firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Demore*, 538 U.S. at 522. That is because "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government," which are core sovereign powers. *Id.* (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 n.17 (1976)); *see also id.* ("The liberty rights of the aliens before us here are subject to limitations and conditions not applicable to citizens.") (quoting *Zadvydas*, 533 U.S. at 718 (Kennedy, J., dissenting)). The Supreme Court has accordingly long upheld Congress's authorization of "detention during deportation proceedings as a constitutionally valid aspect of the deportation process." *Id.* at 523; *see also Flores*, 507 U.S. at 306 ("Congress has the authority to detain aliens suspected of entering the country illegally pending their deportation hearings.").

The government contends that the unique constitutional treatment of detained aliens means that we should not apply the traditional test set forth in *Mathews v. Eldridge*, 424 U.S.

319 (1976), in assessing Rodriguez Diaz's due process claims. Although the government is not specific about the test we should apply instead, it appears to desire a framework that focuses more exclusively on the government's asserted interests in detaining aliens who are subject to removal. As the government points out, the Supreme Court when confronted with constitutional challenges to immigration detention has not resolved them through express application of *Mathews*. *See, e.g.*, *Demore*, 538 U.S. at 523, 526–29; *see also Dusenbery v. United States*, 534 U.S. 161, 168 (2002) ("[W]e have never viewed *Mathews* as announcing an all-embracing test for deciding due process claims.").

While we acknowledge the government's arguments, we note that when considering due process challenges to § 1226(a) like the one here, other circuits (reaching conflicting outcomes) have applied the *Mathews* test. *See Miranda*, 34 F.4th at 358–59; *Hernandez-Lara*, 10 F.4th at 27–28; *Velasco Lopez*, 978 F.3d at 851. We have also applied *Mathews* in holding that the IJ is required to consider financial circumstances and alternative conditions of release in setting a monetary bond under § 1226(a). *Hernandez v. Sessions*, 872 F.3d 976, 993–95 (9th Cir. 2017). And we have regularly applied *Mathews* to due process challenges to removal proceedings. *See, e.g.*, *Cruz Pleitez v. Barr*, 938 F.3d 1141, 1145–46 (9th Cir. 2019); *Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1160–61 (9th Cir. 2004); *Martinez-de Bojorquez v. Ashcroft*, 365 F.3d 800, 805 (9th Cir. 2004). The Supreme Court also applied *Mathews* in *Landon v. Plasencia*, 459 U.S. 21 (1982), in considering a due process challenge to an immigration exclusion hearing. *See id.* at 34–35.

Ultimately, *Mathews* remains a flexible test that can and must account for the heightened governmental interest in the

immigration detention context.  *See id.* at 34; *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 716 (9th Cir. 2011) (stating that *Mathews* "is not a bright line test, but is flexible depending on the circumstances") (quoting *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 589 (9th Cir. 1998)).  And as we will explain, Rodriguez Diaz's claims fail even under the *Mathews* test, which is presumably more favorable to him than the test the government seeks.  Thus, we assume without deciding that *Mathews* applies here.

### C

Under *Mathews*, the "identification of the specific dictates of due process generally requires consideration of three distinct factors."  424 U.S. at 334–35.  "*First*, the private interest that will be affected by the official action; *second*, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and *finally*, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Id.* at 335 (emphasis added).

The first *Mathews* factor, Rodriguez Diaz's private interest, weighs in his favor.  Because, by the time of the district court decision, Rodriguez Diaz was detained for fourteen months following his first bond hearing, we will assume that his detention qualifies as "prolonged" in a general sense.  *See Diouf II*, 634 F.3d at 1091 (holding that once "the alien has been detained for approximately six months," "continuing detention becomes prolonged"); *Zadvydas*, 533 U.S. at 701 (recognizing six months as a presumptively constitutional removal period).  We have also held, more generally, that an individual's private interest in "freedom from prolonged detention" is "unquestionably

substantial." *Singh*, 638 F.3d at 1208. Even though *Singh* and *Diouf II* do not govern this case, the government for its part does not seriously dispute that Rodriguez Diaz has a legitimate and reasonably strong private liberty interest under *Mathews*.

But it is important not to overstate the strength of Rodriguez Diaz's showing under the first *Mathews* factor, either. With the possible exception of our now-overruled decision in *Rodriguez III*, 804 F.3d at 1084–85, when we have previously referred to detentions longer than six months as "prolonged," we have done so in the context of detentions for which no individualized bond hearings had taken place at all because the statutes on their faces did not allow for them. *See, e.g.*, *Aleman Gonzalez*, 955 F.3d at 772; *Diouf II*, 634 F.3d at 1091–92 & n.13. Here, Rodriguez Diaz received a bond hearing approximately two months after he was detained under § 1226(a). He later sought a renewed custody hearing based on allegedly changed circumstances. Although by that point Rodriguez Diaz had been detained for approximately fourteen months, he was not without process during that time because a further bonding hearing before an IJ was available to him throughout the period of his detention upon a showing of materially changed circumstances. *See* 8 C.F.R. § 1003.19(e).

We also cannot overlook that most of the period of Rodriguez Diaz's detention arose from the fact that he chose to challenge before the BIA and later this Court the IJ's denial of immigration relief. *See Demore*, 538 U.S. at 531 n.14 ("'[T]he legal system is replete with situations requiring the making of difficult judgments as to which course to follow,' and, even in the criminal context, there is no constitutional prohibition against requiring parties to make such choices.") (quoting *McGautha v. California*, 402 U.S. 183, 213 (1971)); *see also Prieto-Romero*, 534 F.3d at 1063–

65 & n.9 (holding that an alien's detention was not unconstitutionally indefinite when it was prolonged by a challenge to his removal order, and distinguishing a case in which the government made an "unusual move" that delayed resolution) (quotations omitted).  Rodriguez Diaz's private interests are further diminished by the fact that he is subject to an order of removal from the United States.

In short, in evaluating Rodriguez Diaz's interests under the first prong of the *Mathews* analysis, we cannot simply count his months of detention and leave it at that.  We must also consider the process he received during this time, the further process that was available to him, and the fact that his detention was prolonged due to his decision to challenge his removal order.  Indeed, as the government points out, by Rodriguez Diaz's (and the dissent's) logic, § 1226(a) would be unconstitutional as to most any alien who elects to challenge a removal order, given the amount of time such a typically challenge takes.[7]

Taking the third *Mathews* factor next, the government clearly has a strong interest in preventing aliens from "remain[ing] in the United States in violation of our law." *Demore*, 538 U.S. at 518 (quotations omitted).  Enforcement of our immigration law serves both a domestic law

---

[7] The dissent also would find relevant to the first *Mathews* factor the fact that "Rodriguez Diaz did not receive the procedural protections afforded to an individual in the criminal justice system . . . including the right to counsel and or a speedy trial."  But it is well-established that immigration proceedings are "civil proceeding[s], in which many of the protections afforded in the criminal context do not apply." *El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Rev.*, 959 F.2d 742, 751 (9th Cir. 1991) (citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984)).

enforcement and foreign relations function. The Supreme Court has thus specifically instructed that in a *Mathews* analysis, we "must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Plasencia*, 459 U.S. at 34. "Over no conceivable subject is the legislative power of Congress more complete." *Flores*, 507 U.S. at 305 (quotations and alterations omitted).

This is especially true when it comes to determining whether removable aliens must be released on bond during the pendency of removal proceedings. The government has an obvious interest in "protecting the public from dangerous criminal aliens." *Demore*, 538 U.S. at 515 (noting the government's justifications for the mandatory detention policy in § 1226(c)). Through detention, the government likewise seeks to "increas[e] the chance that, if ordered removed, the aliens will be successfully removed." *Id.* at 528; *see also Nken v. Holder*, 556 U.S. 418, 436 (2009) ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable . . . permits and prolongs a continuing violation of United States law.") (quotations and alteration omitted).

These are interests of the highest order that only increase with the passage of time. The longer detention lasts and the longer the challenges to an IJ's order of removal take, the more resources the government devotes to securing an alien's ultimate removal. The risk of a detainee absconding also inevitably escalates as the time for removal becomes more imminent. *See Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2290 (2021); *see also Demore*, 538 U.S. at 519 (noting that Congress was presented with evidence that "[d]etention is the key to effective deportation") (quotations omitted).

Indeed, the Supreme Court has specifically recognized Congress's determination that the government has been unable to remove deportable criminal aliens because of its initial failure to detain them. *Demore*, 538 U.S. at 519. For all these reasons, the government's interests in this case are significant.[8]

The second *Mathews* factor is "the risk of an erroneous deprivation of [Rodriguez Diaz's] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. Here, we conclude that the existing agency procedures sufficiently protected Rodriguez Diaz's liberty interest and mitigated the risk of erroneous deprivation.

Pursuant to § 1226(a) and its implementing regulations, when ICE initially detained Rodriguez Diaz, an ICE officer made an individualized custody determination. *See* 8 C.F.R. § 236.1(c)(8). This involved evaluating Rodriguez Diaz's likelihood of "appear[ing] for any future proceedings" and potential "danger to property or persons." *Id.* Rodriguez Diaz was then able to request a second custody determination before an IJ. *Id.* §§ 236.1(d)(1), 1003.19(b). Within two months, Rodriguez Diaz received that bond hearing, at which he was represented by counsel and could

---

[8] The dissent errs in claiming, without proper support, that "the government's interest remains constant over the course of an individual's detention." And while the dissent points out that aliens detained under § 1231 are even more likely to abscond, *see Guzman Chavez*, 141 S. Ct. at 2290, that only confirms our point that the closer an alien is to being removed, the greater the risk of flight. Equally unfounded is the dissent's contention that we have "presume[d] Rodriguez Diaz will lose his appeal to the BIA and his petition for review to us." We have indulged no such presumption.

present evidence that might bear on the IJ's determination. After the IJ denied bond on account of Rodriguez Diaz's gang affiliation, Rodriguez Diaz had the right to appeal to the BIA.  *See id.* § 236.1(d)(3).

Although the IJ's discretionary bond determination was not reviewable in federal court, *see* 8 U.S.C. § 1226(e), we would have had jurisdiction under 28 U.S.C. § 2241 to consider any error of law in Rodriguez Diaz's agency proceedings, including any claimed due process violation. *See Martinez v. Clark*, 36 F.4th 1219, 1224 (9th Cir. 2022) (holding that federal courts have habeas jurisdiction over "questions of law or constitutional questions" but not "an immigration court's determination that a noncitizen is a danger to the community"); *see also Singh*, 638 F.3d at 1207 n.6.

Moreover, as we noted above, throughout the course of his detention, Rodriguez Diaz has had the right to seek an additional bond hearing if his circumstances materially change.  *See* 8 C.F.R. § 1003.19(e).  After the vacatur of his conviction for possession of a controlled substance, Rodriguez Diaz availed himself of this right and sought what would have been his third custody determination, and his second before an IJ.  The IJ denied this request because the IJ's initial decision was based on Rodriguez Diaz's gang affiliation (and his false testimony on that point), which the vacated conviction did not affect.  Once more, Rodriguez Diaz had the right to appeal to the BIA, and he did so.  *See generally id.* § 1003.19.  Nothing would have prevented Rodriguez Diaz from seeking further bond redeterminations based on materially changed circumstances that might arise in the future over the course of his detention.  And to the extent that the agency made errors of law in denying Rodriguez Diaz's requests, these decisions would also be subject to judicial review in habeas.  *Martinez*, 36 F.4th at

1224.

In short, the agency's decision to detain Rodriguez Diaz was subject to numerous levels of review, each offering Rodriguez Diaz the opportunity to be heard by a neutral decisionmaker.  These procedures ensured that the risk of erroneous deprivation would be "relatively small."  *See Yagman v. Garcetti*, 852 F.3d 859, 865 (9th Cir. 2017) (upholding a scheme that offered "an opportunity to present evidence and arguments" that would be "considered by the reviewer").  The process that Rodriguez Diaz received was substantially more extensive than in those cases in which we (in error) invoked the doctrine of constitutional avoidance to require additional procedures.  *See Casas*, 535 F.3d at 945 (seven years of detention with no opportunity to seek release on bond, and no indication of opportunity for renewed hearing based on changed circumstances); *Singh*, 638 F.3d at 1203 (same for 16 months of detention); *Rodriguez III*, 804 F.3d at 1066, 1072 (same for nearly four and a half years of detention for one class member).

We also note that Rodriguez Diaz received further procedural protections on the merits of his applications for relief from removal.  This included the opportunity to seek a temporary stay of removal, which he sought and received.  Although further review of his removal order would take additional time and could thereby prolong his detention, Rodriguez Diaz in this case has not demonstrated that the fact of the review process following its ordinary course itself created a due process violation.  *See Demore*, 538 U.S. at 531 n.14; *Prieto-Romero*, 534 F.3d at 1063–65 & n.9.

**D**

In response, Rodriguez Diaz advances several reasons why he believes § 1226(a)'s procedures are constitutionally

inadequate.  None is persuasive.

**1**

*First*, Rodriguez Diaz claims that he should not have borne the burden of proof at his initial bond hearing.  In support of this position, he points to cases requiring the government to justify the necessity of civil confinement for U.S. citizens in various contexts.  *See, e.g.*, *Foucha v. Louisiana*, 504 U.S. 71, 71, 80–82 (1992) (involuntary psychiatric commitment of individuals acquitted of crimes after presenting an insanity defense); *United States v. Salerno*, 481 U.S. 739, 750–52 (1987) (pretrial detention); *Addington v. Texas*, 441 U.S. 418, 425–27 (1979) (involuntary commitment to a mental hospital).

It is true that we relied on this line of cases in *Singh*. *Singh*, 638 F.3d at 1203–04.  But for the reasons we have explained, *Singh* does not govern here.  And even assuming *Singh* could remain good law in the § 1226(c) context, the *Mathews* balancing there presented different considerations than in this case.  *See Borbot*, 906 F.3d at 278 (holding that "the reasonableness inquiry we performed in [§ 1226(c) cases] is inappropriate in the context of § 1226(a)" because the inquiry is "a balancing framework that makes any determination on reasonableness highly fact-specific") (quotations omitted); *cf. Martinez*, 36 F.4th at 1231 (holding that "*Singh* offers the high-water mark of procedural protections required by due process," and declining to "extend those protections any further" in a different context).

In *Singh*, the detainee had the right to a "*Casas* hearing" and its attendant procedures only after his *§ 1226(c)* detention had become "prolonged," which we later defined to mean more than six months.  *See Singh*, 638 F.3d at 1201; *Diouf II*, 634 F.3d at 1091.  By comparison, Rodriguez Diaz

was subject to § 1226(a) and its bond determination processes from the onset of his detention.  We therefore respectfully disagree with the dissent that *Singh*, which does not govern here, is "informative" as to the *Mathews* balancing analysis in this case.

We have not previously held that cases involving heightened burdens of proof for the deprivation of liberty interests of U.S. citizens apply coextensively to alien detainees who have been subject to § 1226(a) and its procedures throughout the period of their detention.  When, as here, those processes have been available to the alien from the beginning, we think under *Mathews* that the more applicable line of authority is the Supreme Court's immigration detention cases.  *See Miranda*, 34 F.4th at 359 & n.9 (agreeing that the Supreme Court's civil commitment cases are inapposite because they "involved detention of United States citizens whereas § 1226(a) involves detention of aliens awaiting removal hearings").

In that respect, the Supreme Court has been clear: the Constitution permits "rules that would be unacceptable if applied to citizens."  *Demore*, 538 U.S. at 521; *see also Miranda*, 34 F.4th at 359.  That established principle is particularly relevant here when the Supreme Court has also previously upheld immigration detention schemes that offered no opportunity for a bond hearing, much less one in which the government bore the burden of proof.  *See Demore*, 538 U.S. at 513 (no bond hearing for § 1226(c) detainees "for the brief period necessary for their removal proceedings"); *Flores*, 507 U.S. at 303–04 (no "individualized hearing on whether private placement would be in the child's 'best interests'" for minors detained while awaiting deportation hearings); *Carlson v. Landon*, 342 U.S. 524, 527–29, 542 (1952) (no bail hearing for detainees awaiting their deportation hearing after the government

"made allegation, supported by affidavits" that they belonged to the Communist Party).  We are aware of no Supreme Court case placing the burden on the government to justify the continued detention of an alien, much less through an elevated "clear and convincing" showing.  *See Miranda*, 34 F.4th at 362–63.[9]

Nevertheless, *amici* supporting Rodriguez Diaz attempt to expand on this part of his argument.  They claim that placing the burden on the alien creates an unacceptably high risk of erroneous deprivation because detainees "face tremendous language and cultural barriers," have "difficulty . . . obtaining evidence," and "often lack financial resources to hire an attorney."  The dissent makes some of these same points.

Whatever the merit of these arguments in other cases— and without deciding whether they could ever create procedural error of constitutional magnitude—they bear no relation to the facts of this case.  Nor have *amici* demonstrated that these issues are universally present such that "no set of circumstances exists under which the statute

---

[9] Indeed, as a historical matter, detained aliens did not receive bond hearings.  *Demore*, 538 U.S. at 523 n.7.  In that regard, we note that we do not consider in this case a constitutional challenge to any other provision allowing the detention of aliens.  Nor do we decide whether the government's potentially stronger interest in detaining such persons would affect the due process analysis.  *See, e.g.*, *Zadvydas*, 553 U.S. at 693 (noting that "certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders," and that "terrorism or other special circumstances" may also call for "heightened deference to the judgments of the political branches").

would be valid." *Young*, 992 F.3d at 779 (quotations and alterations omitted).

Here, Rodriguez Diaz was represented by an attorney for his initial bond hearing as well as his request for a new hearing. He states that he is "more comfortable in English than Spanish." And he was able to gather considerable evidence in support of his motion for a new bond hearing, including five declarations from family members, twenty letters of support from other individuals, six certificates of completion for rehabilitation courses, his marriage license, his wife's medical records, his son's birth record, and documents bearing on his criminal record.

Rodriguez Diaz has not alleged difficulty obtaining any piece of evidence, much less evidence that would be in the government's hands. Moreover, to the extent such information existed and Rodriguez Diaz was unable to obtain it, § 1226(a)'s procedures would have allowed Rodriguez Diaz to raise that fact for the IJ's consideration. Nothing in this record suggests that placing the burden of proof on the government was constitutionally necessary to minimize the risk of error, much less that such burden-shifting would be constitutionally necessary in all, most, or many cases. There is no reason to believe that, as a general proposition, the government will invariably have more evidence than the alien on most issues bearing on alleged lack of future dangerousness or flight risk. *See Miranda*, 34 F.4th at 362 (explaining that aliens should have "as much or more" knowledge about "their own criminal history," "any mitigating evidence related to that history," "family or employment information," and the alien's entry into the United States).

**2**

*Second*, Rodriguez Diaz objects to the need to show changed circumstances in order to receive a second bond hearing.  He argues that his liberty interest increases over time as he remains detained, and so at some point, he should become entitled to a new bond hearing regardless of whether his circumstances have changed.

The problem with this argument is that on these facts, "duration alone" cannot "sustain a due process challenge by a detainee who has been afforded the process contemplated by § 1226(a) and its implementing regulations." *Borbot*, 906 F.3d at 277; *see also Prieto-Romero*, 534 F.3d at 1063 (denying habeas relief to an alien detained for three years under § 1226(a) because the lack of a "certain end date" alone "does not render his detention *indefinite* in the sense the Supreme Court found constitutionally problematic in *Zadvydas*").  The procedures that allow for aliens to seek new bond hearings based on changed circumstances reduce, rather than increase, the risk of erroneous deprivation.  And in all events, "[d]ue process does not, of course, require two hearings."  *Goldberg v. Kelly*, 397 U.S. 254, 267 n.14 (1970).  When Rodriguez Diaz was already free to raise changed circumstances with the IJ in requesting a new bond hearing, the duration of his detention, by itself, did not create a due process violation.

**3**

*Finally*, Rodriguez Diaz claims that the IJ's denial of his requests for bond "show[] that the procedures in place *did* result in an erroneous deprivation of Mr. Rodriguez Diaz's private liberty interest."  But this is merely a disagreement with the merits of the IJ's decision, which we lack jurisdiction to review.  *See* 8 U.S.C. § 1226(e); *Martinez*, 36 F.4th at 1224; *see also Borbot*, 906 F.3d at 279 ("Borbot's habeas petition seeks to compel a second bond hearing

despite alleging no constitutional defect in the one he received.  This comes close to asking this Court to directly review the IJ's bond decision, a task Congress has expressly forbidden us from undertaking.").  That Rodriguez Diaz objects to the outcome of his proceedings does not demonstrate a procedural due process violation.  *See Foss*, 161 F.3d at 590 (rejecting the plaintiff's argument that "because he was ultimately denied a permit, the procedures are inherently inadequate").

The dissent makes a similar mistake in reasoning that because the IJ in complying with the district court's incorrect ruling allowed Rodriguez Diaz to be released on bond, "in real life terms the risk that Rodriguez Diaz was erroneously deprived of his liberty interest was one hundred percent." That assertion assumes the conclusion as to whether placing a "clear and convincing" burden on the government was proper in the first place.  For the reasons we have explained, it was not.  That different procedures can produce different results does not prove that the procedures governing the IJ's earlier denial of bond violated due process or that the IJ's earlier decision was in error.  *See Ching v. Mayorkas*, 725 F.3d 1149, 1156 (9th Cir. 2013) ("It is process that the procedural due process right protects, not the outcome.").

**4**

In sum, while Rodriguez Diaz's private interest and the government's interests are both substantial here, the private interest of a detained alien under § 1226(a) is lower than that of a detained U.S. citizen, and the governmental interests are significantly higher in the immigration detention context. These interests can be compared to those at stake in prior cases in which the Supreme Court has upheld immigration detention schemes.  *See Demore*, 538 U.S. at 513; *Carlson*, 342 U.S. at 527; *Flores*, 507 U.S. at 303.  Yet Rodriguez

Diaz has already received far more process than the detainees in those cases. And he has not pointed to any individualized circumstances warranting additional procedures, or any unconstitutional failure of the § 1226(a) procedures in his case.

Although Congress could decide to provide additional process to persons like Rodriguez Diaz, the Due Process Clause does not mandate procedures that reduce the risk of erroneous deprivation to zero, a result that is beyond grasp. As we have held, the Constitution does not "require the government to undertake every possible effort to mitigate the risk of erroneous deprivation and the potential harm to the private party." *Kashem v. Barr*, 941 F.3d 358, 379 (9th Cir. 2019) (quotations omitted). Instead, the Supreme Court has told us, "[t]he role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy." *Landon*, 459 U.S. at 34–35. That is the approach we have followed here. For the reasons given, § 1226(a)'s procedures satisfy due process, both facially and as applied to Rodriguez Diaz.

In so holding, we do not foreclose all as-applied challenges to § 1226(a)'s procedures. "Due process is a flexible concept that varies with the particular situation." *See Yagman*, 852 F.3d at 863 (quoting *Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015)). The government agrees that its position here does not mean detained aliens can never bring as-applied due process challenges to § 1226(a). Other courts and jurists have indicated agreement with this view. *See Borbot*, 906 F.3d at 280 (declining to decide whether in other circumstances "detention under § 1226(a) might become unreasonably prolonged, whether by virtue of government delay or some other cause");

*Hernandez-Lara*, 10 F.4th at 57 (Lynch, J., dissenting) ("It may be, of course, that in some circumstances detention of [a noncitizen] would not pass constitutional muster.") (quoting *Schall v. Martin*, 467 U.S. 253, 273 (1984)) (alterations in original); *cf. Demore*, 538 U.S. at 532–33 (Kennedy, J. concurring) ("Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons.").

We have no occasion to consider the constitutional limits of prolonged immigration detention because Rodriguez Diaz has not demonstrated a due process violation in this case. And we note that even when there are deficiencies in individual § 1226(a) proceedings, they may be redressable through means short of major changes to the burden of proof. *See Miranda*, 34 F.4th at 361 (explaining that if particular procedures are problematic, "they—rather than the burden of proof—should be the subject of [a petitioner's] challenge").

\*   \*   \*

We reverse the judgment of the district court and remand for dismissal of Rodriguez Diaz's habeas petition.

**REVERSED AND REMANDED.**

BUMATAY, Circuit Judge, concurring:

To the extent that our court's precedent requires us to decide this case through the lens of *Mathews v. Eldridge*, 424

U.S. 319 (1976), I fully join Judge Bress's fine opinion. Under the *Mathews* balancing test, due process does not require aliens detained under 8 U.S.C. § 1226(a) to receive another bond hearing after a certain number of months.

But I think this case is better decided through the text, structure, and history of the Constitution, rather than through interest balancing.  In resolving similar immigration-detention challenges, the Supreme Court has not relied on the *Mathews* framework.  *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 521-31 (2003); *Reno v. Flores*, 507 U.S. 292, 299–315 (1993).  And the Court has recently backed away from multi-factorial "grand unified theor[ies]" for resolving legal issues. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2427 (2022) (simplified).  Maybe because the outcome of such tests often "depends to a great extent upon how the Court subjectively views the underlying interests at stake." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 562 (1985) (Rehnquist, J., dissenting).

And under the original understanding of the Due Process Clause, Aroldo Rodriguez Diaz's claim that he is entitled to periodic supplemental bond hearings in which the government bears the burden of proof by clear and convincing evidence must fail.  As a matter of text, structure, and history, Congress may authorize the government to detain removable aliens throughout their removal proceedings.  Nothing in the Due Process Clause requires individualized bond determinations beyond what Congress has established in § 1226(a)—let alone under the heightened burden placed on the government by the district court here. So I concur in reversing the district court's grant of habeas corpus.

**I.**

**A.**

Under our Constitution, "the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018) (simplified). Because such policies implicate national security, foreign affairs, and political and economic judgments, judges may not serve as "Platonic Guardians" of our nation's immigration policies. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 687 (9th Cir. 2021) (Bumatay, J., dissenting from the denial of rehearing en banc) (quoting L. Hand, The Bill of Rights 73 (1958)). Instead, decisions about aliens are "of a character more appropriate to either the Legislature or the Executive than to the Judiciary," *Mathews v. Diaz*, 426 U.S. 67, 81 (1976), and so our duty is to largely defer to the political branches on these questions. In other words, in the immigration context, "Congressional powers are at their apex and judicial powers are at their nadir." *Hernandez-Lara v. Lyons*, 10 F.4th 19, 54 (1st Cir. 2021) (Lynch, J., dissenting).

That judicial deference reaches back to the start of our Nation. Prompted by the controversial Alien Act of 1798, our Founding generation grappled with the scope of constitutional protections for aliens. *See* Gerald L. Neuman, Strangers to the Constitution 52–63 (1996). The Act gave the President the power to expel any alien he found "dangerous to the peace and safety of the United States" or "suspect[ed] [of being] concerned in any treasonable or secret machinations against the government." Alien Act, ch. 58, 1 Stat. 570 (1798). And that broad authority gave rise to three general views of the Constitution's relationship to aliens. Neuman at 52–63.

On one end, the Federalists supported the constitutionality of the Act because, in their view, aliens were not members of the political community entitled to constitutional protections. *Id.* at 52–56. For example, George Keith Taylor, a Federalist member of the Virginia House of Delegates, explained that "aliens[,] not being a party to the [constitutional] compact, were not bound by it to the performance of any particular duty, nor did it confer upon them any rights." Debate on Virginia Resolutions, reprinted in the Virginia Report of 1799–1800 34 (1850). And since an alien only had the *privilege* to stay in the country, the Federalists argued that removal from the country did not "deprive the alien of liberty or any other right" and "procedural rights d[id] not attach" to removal proceedings. Neuman at 54.

At the other end, the Jeffersonian Democratic-Republicans viewed the Act as an erosion of the constitutional rights of aliens. *Id.* at 53–54, 57–60. Relying on constitutional provisions that broadly apply to "person[s]," they emphasized that aliens were entitled to constitutional protections. *Id.* at 57. And they thought the Act did not provide those protections because it failed to provide aliens "with all the accouterments of a criminal trial." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1245 (2018) (Thomas, J., dissenting). For instance, then-Representative Edward Livingston argued:

> [A]lien friends . . . residing among us, are entitled to the protection of our laws, and that during their residence they owe a temporary allegiance to our Government. If they are accused of violating this allegiance, the same laws which interpose in the case of a citizen must determine the truth of the accusation,

and if found guilty they are liable to the same punishment.

8 Annals of Cong. 2012 (1798).  And even if aliens were not full "parties to the Constitution," James Madison expressed that "it will not be disputed, that as they owe, on one hand, a temporary obedience, they are entitled, in return, to their protection and advantage."  Madison's Report on the Virginia Resolutions, reprinted in 4 The Debates, in the Several State Conventions on the Adoption of the Federal Constitution 556 (Jonathan Elliot 2d ed. 1888).

From this debate arose a more moderate Federalist position.  John Marshall, in rebutting the Democratic-Republicans' arguments, no longer denied the constitutional rights of aliens, but defended the Act on narrower grounds.  "Certainly a vested right is to be taken from no individual without a solemn trial," Marshall said, "but the right of remaining in our country is vested in no alien; he enters and remains by the courtesy of the sovereign power, and that courtesy may at pleasure be withdrawn."  The Address of the Minority in the Virginia Legislature to the People of that State; containing a Vindication of the Constitutionality of the Alien and Sedition Laws 9–10 (1799).  So while Marshall seemingly accepted the extension of constitutional rights to aliens, he also noted that the removal context is a unique enclave within the Constitution.  And although "no obvious immediate winner" emerged from the debates on the Constitution's relationship to aliens, the Marshall view has remained most influential.  Neuman at 60.

As Congress began legislating in the immigration context in the late 19th century,[1] the Supreme Court largely adopted the moderate Marshall position. In the 1880s, the Court recognized that aliens are "persons" under the Fourteenth Amendment, entitled to the Amendment's due process protections. *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). But a few years later, the Court affirmed the federal government's power to deport them without the protections of the criminal process. *Fong Yue Ting v. United States*, 149 U.S. 698, 724–32 (1893). The Court accepted that "[aliens] are entitled, so long as they are permitted by the government of the United States to remain in the country, to the safeguards of the constitution, and to the protection of the laws." *Id.* at 724. But it also said that aliens "remain subject to the power of [C]ongress to expel them, or to order them to be removed and deported from the country, whenever, in its judgment, their removal is necessary or expedient for the public interest." *Id.* And the Court made the point even clearer when it said that "[C]ongress, under the power to exclude or expel aliens, might have directed any [alien] found without a certificate of residence to be removed out of the country b[y] executive officers, without judicial trial or examination." *Id.* at 728.

The moderate Federalist position thus "became part of the American constitutional law concerning immigration," and "[i]t has persisted to this day, making deportation an anomalous qualification to the general recognition of aliens' constitutional rights within the United States territory." Neuman at 62. Indeed, it is now firmly established that,

---

[1] Congress did not enact removal statutes for nearly a century after the lapse of the Alien Act of 1798 in 1800. Rather, the States enacted their own immigration laws until Congress reasserted itself. *See* Neuman at 19–43.

when it comes to immigration, "Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Demore*, 538 U.S. at 522.

**B.**

Concomitant with the political branches' broad authority to regulate immigration matters comes the power to detain aliens during removal proceedings. For over a century, whenever Congress has granted the Executive authority to detain aliens pending removal proceedings, the Supreme Court has repeatedly upheld such detention as consistent with the Constitution.

The Court made its first mark in this area in *Wong Wing v. United States*, 163 U.S. 228 (1896). There, aliens of Chinese descent were sentenced to one year of imprisonment and hard labor before deportation under the 1892 extension of the Chinese Exclusion Act. *Id.* at 230–38. The Court held that the punishment, imposed against aliens without a judicial trial, was unconstitutional under the Fifth Amendment. *Id.* at 237–38. But it also went out of its way to separate criminal punishment from temporary detention during removal proceedings. The Court thought "it clear that detention or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens, would be valid." *Id.* at 235. Otherwise, "[p]roceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation." *Id.*

Over a half-century later, the Court addressed the constitutionality of detaining an alien without bond during removal proceedings. *Carlson v. Landon*, 342 U.S. 524 (1952). There, the Internal Security Act of 1952 permitted

the Attorney General to detain aliens charged with membership in the Communist Party or other prohibited classes without bail pending determination of deportability. *Id.* at 528–29. Several detained aliens claimed that due process required individualized determinations that their detention was necessary to protect the country or to secure their presence at deportation proceedings. *Id.* at 528-34. The Court rejected the argument because "[d]etention is necessarily a part of this deportation procedure." *Id.* at 538. Based on the 1952 Act, it held that the Attorney General properly had the discretionary power to detain aliens without bond during the deportation process, even without individualized determinations of flight risk or dangerousness. *Id.* Detention was justified simply "by reference to the legislative scheme" enacted by Congress— in that case, based on the Legislature's decision "to eradicate the evils of Communist activity." *Id.* at 543. In other words, when Congress granted the Executive broad discretion to detain aliens pending removal, the Court deferred to that decision.

Near the turn of this century, the Court rejected due process challenges to a regulation placing unaccompanied alien juveniles in detention or other government-approved facilities unless they could be released into the custody of their parents, relatives, or legal guardians. *Flores*, 507 U.S. at 297, 301-15. In upholding the detention of the juvenile aliens, the Court reaffirmed the political branches' broad power over aliens. As the Court said, "[i]f we harbored any doubts as to the constitutionality of institutional custody over unaccompanied juveniles, they would surely be eliminated as to those juveniles . . . who are aliens." *Id.* at 305. That's because "Congress has the authority to detain aliens suspected of entering the country illegally pending their deportation hearings." *Id.* at 306. And Congress had

eliminated any "presumption of release pending deportation"—instead, committing that determination to the discretion of the Executive by statute. *Id.* (citing 8 U.S.C. § 1252(a)(1)). The Executive, the Court said, does not need to "forswear use of reasonable presumptions and generic rules" in exercising its discretion to detain aliens. *Id.* at 313. And so, due process is satisfied when, "[i]n the case of each detained alien juvenile," the government makes "determinations that are specific to the individual and necessary to accurate application of the regulation," such as whether the alien is a deportable minor. *Id.* at 313–14.

And most recently, the Court denied a constitutional attack on the mandatory detention of aliens convicted of certain criminal offenses during removal proceedings under 8 U.S.C. § 1226(c). *Demore*, 538 U.S. at 521-31. Relying on a century of precedent, the Court acknowledged that aliens are entitled to due process, but that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." *Id.* at 523. It also observed that "Congress' power to detain aliens in connection with removal or exclusion . . . is part of the Legislature's considerable authority over immigration matters." *Id.* (simplified). And so long as detention is only during removal proceedings, it "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Id.* at 528. Due process, the Court said, "does not require [the government] to employ the least burdensome means to accomplish its goal," *id.*, so courts must usually defer to Congress's view of what is necessary to effect removals. And importantly, the Court didn't adopt any bright-line timelines for when that deference changes. *See id.* at 530–31 (affirming the alien's mandatory detention

even though it lasted for more than six months when the alien himself requested continuances of his removal hearings).

To be sure, the Court has distinguished the detention of aliens that "did not serve its purported immigration purpose." *Id.* at 527. In *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Court dealt with aliens challenging their detention following final orders of deportation, but for which removal was "no longer practically attainable." *Id.* at 690. Because these aliens were unlikely to be removed, their "detention no longer b[ore] a reasonable relation to the purpose for which the individual was committed." *Id.* (simplified). "[A] serious constitutional problem" would then arise, the Court said, if the potentially indefinite and permanent detention of aliens lost any relation to an immigration purpose, such as preventing flight before removal. *Id.* at 692. Indeed, the Court emphasized that "post-removal-period detention, *unlike detention pending a determination of removability . . .* has no obvious termination point." *Id.* at 697 (emphasis added).

This history provides a clear lesson. Consistent with due process, Congress may grant the Executive the authority to detain aliens during removal proceedings—with or without bond hearings. And so long as the government follows reasonable, individualized determinations to ensure that the alien is properly in removal proceedings, due process does not require more bond hearings even after a prolonged period.

That's not to say, however, that there aren't outer limits to this principle. If the government were to "unreasonabl[y] delay" removal proceedings, "it could become necessary . . . to inquire whether the detention is not to facilitate [removal], or to protect against risk of flight or

dangerousness, but to incarcerate for other reasons." *Demore*, 538 U.S. at 532–33 (Kennedy, J., concurring).

With this understanding of immigration detention within the constitutional framework, I turn to 8 U.S.C. § 1226(a) and its application to this case.

## C.

Given this legal backdrop, Rodriguez Diaz's due process rights have not been violated. Through 8 U.S.C. § 1226(a) and its accompanying regulations, Congress and the Executive have provided aliens like Rodriguez Diaz ample protections to satisfy due process. Indeed, Rodriguez Diaz received layer after layer of process:

> **Layer 1**: When an alien is detained, Immigration & Customs Enforcement makes an initial, individualized custody determination. 8 C.F.R. § 236.1(c)(8).
>
> > • ICE may release the alien if it is determined that the alien is neither a danger to the community nor a flight risk. *Id.*
>
> **Layer 2**: If ICE denies bond, the alien can seek an individualized bond hearing before an immigration judge at any time before a final order of removal. *Id.* §§ 236.1(d)(1), 1003.19(b).
>
> > • In making the bond determination, the IJ considers nine factors that inquire into the individual circumstances of the alien. *See In re Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006).

**Layer 3**: If the IJ concludes that the alien should remain detained, the alien can appeal the decision to the BIA.  8 C.F.R. § 236.1(d)(3).

**Layer 4**: The alien can also request another bond hearing based on materially changed circumstances. *Id.* § 1003.19(e).

On top of all of that, aliens may seek limited habeas review in federal district court of any "questions of law or constitutional questions." *Martinez v. Clark*, 36 F.4th 1219, 1224 (9th Cir. 2022).

With all this process, Rodriguez Diaz is not entitled to more under the Fifth Amendment.  He makes no claim that § 1226(a) fails to serve an immigration purpose or that his detention was for a reason other than to facilitate his removal.  Thus, nothing about § 1226(a) on its face or as applied to his detention offends due process.  Habeas was thus granted in error.

## II.

Because both my reading of the text, structure, and history of the Constitution and the majority opinion's faithful application of *Mathews* lead to the same result, I concur in the opinion and judgment.

---

WARDLAW, Circuit Judge, dissenting:

I would affirm the district court's decision that the Due Process Clause entitled Rodriguez Diaz to a new bond hearing at which the government bore the burden of proof by a clear and convincing standard of evidence, in light of Rodriguez Diaz's strong, constitutionally protected liberty

interests at stake. *See Foucha v. Louisiana,* 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." (citation omitted)). While I agree that the test developed in *Mathews v. Eldridge,* 424 U.S. 319 (1976), is the appropriate legal framework to determine whether there was a due process violation here, I cannot agree with the majority's balancing of the *Mathews* factors. Although there is no question that the government has a strong interest, the majority fails to account for the high risk of procedural error and the importance of Rodriguez Diaz's strong individual liberty interest. I respectfully dissent.

## I.

The majority opinion omits the details of Rodriguez Diaz's life and childhood, stating only that he "enter[ed] this country illegally on a date and location unknown." **Majority Op. 1–2.** Aroldo Alberto Rodriguez Diaz, a Salvadoran national, fled El Salvador as a child. Since he arrived in the United States as a young boy, Rodriguez Diaz has developed strong ties here. His wife and infant son, both of whom are United States citizens, and his entire extended family, reside in the U.S.

As a child, Rodriguez Diaz spent most of his life separated from his parents. After a difficult childhood, Rodriguez Diaz struggled to adjust to life in a new country. He was often reprimanded at school for failing at schoolwork that was not in his native language. As a teenager, he was reunited with his parents from whom he had been separated for much of his childhood, but as a result, he regularly faced beatings by his father at home. In search of social protection in a dangerous neighborhood and

acceptance from other sources, Rodriguez Diaz became involved with a local gang, the Carnales Locos.

At fifteen years old, Rodriguez Diaz was arrested, transferred to the custody of Immigration and Customs Enforcement (ICE), and placed into removal proceedings. He was transferred again to the custody of the Office of Refugee Resettlement, and because he was a minor, he was released.

After his release, Rodriguez Diaz was arrested for various incidents including possession of burglary tools, possession of cocaine, and battery. He was then referred to Camp Glenwood, a program for troubled juveniles, where he completed his GED. After he was released at age eighteen, he stopped participating in the activities of the Carnales Locos. When he expressed his desire to leave, he was threatened that he would face "consequences" from other members.

In 2017, after leaving the Carnales Locos, he met Stephanie Delmonico Rodriguez, and they married and had a son, born on April 27, 2018. On August 3, 2018, Rodriguez Diaz discovered that Delmonico had been unfaithful to him when he found her in another man's car with his son. Shortly after the incident, he called Delmonico on the phone. During the phone call, he called her several names and made threats against her.

After the incident, Rodriguez Diaz was arrested and taken into criminal custody and sentenced to nearly a year in jail and eighteen months' probation. On or about December 18, 2018, ICE re-arrested Rodriguez Diaz following his release from San Mateo County Jail. He was then taken into ICE custody pursuant to 8 U.S.C. § 1226(a), which permits ICE to detain noncitizens pending removal. Rodriguez Diaz

was detained at Yuba County Jail for approximately two months before he received his initial bond hearing.

At his first bond hearing on February 27, 2019, the Immigration Judge (IJ) evaluated whether Rodriguez Diaz presented a flight risk or danger to the community, and denied bond based on Rodriguez Diaz's prior criminal history. During the hearing, in accordance with Board of Immigration Appeals (BIA) precedent, the IJ placed the burden on Rodriguez Diaz to show that he was not a flight risk or danger to the community. The IJ found that Rodriguez Diaz had not met his burden of showing that he did not pose a danger to the community because Rodriguez Diaz's testimony about his gang involvement was not credible.

While in immigration detention, following his initial bond hearing, Rodriguez Diaz made extensive efforts at rehabilitation: he completed courses on Anger Management, Domestic Violence, Substance Abuse, Parenting, Offender Responsibility, and Contentious Relationships, and he secured a case manager through the Second Chance Program, which provides him with services such as mental health counseling, support enrolling in classes, and help removing his gang-related tattoos upon release from custody.

On May 13, 2019, the IJ denied Rodriguez Diaz's application for protection under the Convention Against Torture (CAT) and ordered him removed. However, in the decision the IJ indicated that "the facts and circumstances surrounding [Rodriguez Diaz's] conviction" do not justify a "presumption that he is a danger to the community" because his threats to his wife were "via the telephone and [he] did not do anything further to carry out th[ese] threat[s]."

On September 16, 2019, the Superior Court of San Mateo vacated Rodriguez Diaz's conviction for violation of Cal. Penal Code § 11350, which had previously rendered him ineligible for non-lawful permanent resident cancellation of removal and adjustment of status. Thereafter, Rodriguez Diaz filed a motion to reopen his removal proceedings, which was denied.

After being detained for over a year, on or about February 4, 2020, Rodriguez Diaz requested a new bond hearing, pursuant to 8 C.F.R. 1003.19(e), arguing that (1) his circumstances had materially changed and (2) a hearing was required due to the prolonged duration of his detention in ICE custody.  He provided evidence of his extensive rehabilitation, including the vacatur of his controlled substance conviction.

On February 24, 2020, the IJ rejected Rodriguez Diaz's request for a new bond hearing.  In a memorandum denying the motion on March 26, 2022, the IJ acknowledged the evidence Rodriguez Diaz submitted regarding his rehabilitation and vacated conviction, but found that Rodriguez Diaz's testimony that he had left the gang was not credible because he had lied about his gang membership in the past.  Therefore, the IJ found that Rodriguez Diaz had not shown materially changed circumstances justifying a new bond hearing.

On March 11, 2020, Rodriguez Diaz appealed the denial of a new bond hearing to the BIA, and then subsequently filed a petition for writ of habeas corpus, based on his lengthy detention and the IJ's denial of bond, despite his showing of materially changed circumstances.

On April 27, 2020, the district court granted Rodriguez Diaz a new bond hearing, holding that due process entitled

him to a new bond hearing at which the government bore the burden of proof by a standard of clear and convincing evidence. In accordance with the district court's order, on May 13, 2020, the IJ held a bond hearing at which the government bore the burden of proof. At the hearing, the IJ granted Rodriguez Diaz's request for release and ordered a $10,000 bond. Rodriguez Diaz posted bond and was released on May 15, 2020.

**II.**

The Fifth Amendment Due Process Clause guarantees that the government will not deprive individuals of their liberty without proper procedural safeguards. Due process protections are particularly important when the liberty interest at stake is freedom from imprisonment, as it is "the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (citation omitted). Indeed, the Supreme Court has held that "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

The Fifth Amendment ensures that "[n]o *person*" "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. (emphasis added). The Supreme Court has affirmed that "the Fifth Amendment entitles" all persons including "[noncitizens] to due process of law." *Reno v. Flores*, 507 U.S. 292, 306 (1993); *see also Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d. Cir. 2020); *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011); *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 950 (9th Cir. 2008).

In the immigration context, the government is able to detain an individual during the pendency of his removal proceedings under 8 U.S.C. § 1226(a). But to comply with constitutional due process requirements, the government must provide "adequate procedural protections to ensure that the government's asserted justification for physical confinement [during the pendency of the removal proceeding] outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Singh*, 638 F.3d at 1203 (quoting *Zadvydas*, 533 U.S. at 690) (internal quotation marks omitted).

The statute under which Rodriguez Diaz was detained, 8 U.S.C. § 1226(a), provides procedural protections for detainees that are set out in 8 C.F.R. § 1003.19. Under the federal regulation, when individuals are first detained, they can request a "custody redetermination" in which there is a presumption of detention, and the burden is on the detainees to demonstrate that they do not pose a danger to the community, a threat to national security, or a flight risk. *See In re Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006). After the initial hearing, individuals detained under § 1226(a) do not receive another bond hearing as a matter of right; however, they may request a new bond hearing on the basis of a material change in circumstance. 8 C.F.R. § 1003.19(e).

The question before us is whether the procedures afforded to Rodriguez Diaz under § 1226(a) adequately comply with the Due Process Clause.

### III.

The case law discussing detainees' procedural rights under 8 U.S.C. § 1226, and other related statutory provisions governing immigration detention, is complex and lengthy. The majority opinion provides an accurate overview of the

relevant authority addressing these issues, and correctly states that prior precedent does not resolve Rodriguez Diaz's due process challenge to his detention under § 1226(a). **Majority Op. 9–20.** Further, the majority recognizes that we should be cautious in relying on past cases in this area of law, because those cases generally resolved only the statutory challenges to the government's detention authority, not the constitutional due process issue now before us.[1]

Without binding precedent to rely upon, the majority applies the traditional balancing test set forth in *Mathews* to determine whether Rodriguez Diaz's due process rights were violated, acknowledging that other circuits have applied the *Mathews* test when considering due process challenges to § 1226. *See* 424 U.S. at 319; **Majority Op. 27.** I agree with the majority opinion that *Mathews* is the appropriate test to apply in these circumstances.

However, I disagree with the majority's balancing of and conclusion as to the application of the *Mathew*s factors. While the majority is correct that there is no binding precedent on the constitutional issue here, it disregards key language throughout our past decisions that provides guidance on how best to apply the *Mathews* factors to ensure the procedures under § 1226(a) comport with due process. By ignoring these guiding principles in balancing the

---

[1] The majority cites to our recent decision in *Avilez v. Garland*, 48 F.4th 915 (9th Cir. 2022), and discusses its impact on *Casas* hearings for individuals detained under § 1226(c). Significantly, like our prior decisions the majority discusses, we did not rule in *Avilez* on whether the petitioner was entitled to a bond hearing as a matter of due process, and therefore the decision in *Avilez* does not affect the issue now before us.

*Mathews* factors, the majority inaccurately weighs the fundamental interests at stake.

For example, our discussion regarding the *Mathews* factors in *Singh* is informative on how to balance the competing interests here.[2] *Singh*, 638 F.3d at 1208–09**.** In *Singh*, we held that due process required that the detainee receive a bond hearing in which the government had to show that the "continued detention [was] justified" by a clear and convincing evidence standard. *Id*. at 1200. Significantly, in determining there was a due process violation under the *Mathews* balancing test, we emphasized the "unquestionably substantial" weight of a detained person's liberty interest in "freedom from prolonged detention." *Id.* at 1208.

Further, in its balancing of the *Mathews* factors, the majority disregards case law that guides us to view an individual's liberty interest in freedom from detention on a continuum, with the amount of due process necessary to protect that liberty interest increasing over time. The Supreme Court has recognized that when confinement becomes prolonged, due process requires enhanced

---

[2] As the majority acknowledges, the Supreme Court's decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), did not overrule our decision in *Singh* because "*Singh* was decided on constitutional grounds," and *Jennings* "left open any constitutional questions that prolonged immigration detention may pose." **Majority Op. 16.** The majority emphasizes that it is does not decide "whether *Singh* remains good law" after *Jennings*; however, it also acknowledges that *Singh*'s holding was based "on general principles of procedural due process," including "that a detained person's liberty interest is substantial." *Id.* **at 13, 18 n.4.** It is these constitutional principles, not *Singh*'s holding itself, which are informative on the question before us.

protections to ensure detention remains reasonable in relation to its purpose. For example, in *Demore v. Kim*, 538 U.S. 510, 529 (2003), the Supreme Court held that although a detained person's interest in his liberty is initially outweighed by the government's interest, the balance of interests will eventually flip because a detainee's interest in his liberty continues to increase over time. *See id.* (holding that it was constitutional for the government to detain some noncitizens pending removal under § 1226(c) without a bond hearing because they were detained only a month and a half on average); *see also Zadvydas*, 533 U.S. at 701 ("[F]or detention to remain reasonable," greater justification is needed "as the period of . . . confinement grows."); *Diouf v. Napolitano,* 634 F.3d 1081, 1091 (9th Cir. 2011) (*Diouf II*) ("When the period of detention becomes prolonged . . . greater procedural safeguards are [ ] required."). Moreover, in *Addington v. Texas*, 441 U.S. 418 (1979), the Supreme Court recognized that, in the civil commitment context, for a procedure to be constitutional under the Due Process Clause, it must assign the risk of judicial error to the party with the lesser interest. *See id.* at 427 ("The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state.").

While these cases offer guidance in the balancing of the *Mathews* factors, the Supreme Court has not affirmatively weighed in on what procedural safeguards are required under § 1226(a). With this framework in mind, I now turn to balancing the *Mathews* factors.

## A.

The first *Mathews* factor, the private interest at stake (here, the individual's liberty interest in his freedom from prolonged incarceration) is the greatest possible liberty

interest protected by the Constitution, and therefore weighs strongly in Rodriguez Diaz's favor. *See Foucha,* 504 U.S. at 80.

While the majority acknowledges that Rodriguez Diaz's fourteen-month detention after his first bond hearing qualifies his detention as "prolonged," and therefore creates an "unquestionably substantial" private liberty interest, the majority fails to address how this liberty interest increases the longer an individual is deprived of his liberty. *Singh*, 638 F.3d at 1208; *Zadvydas*, 533 U.S. at 701.

We have previously held that an individual's liberty interest sharply increases after he has been detained for six months. *See Diouf II*, 634 F.3d at 1091–92 ("When detention crosses the six-month threshold and release or removal is not imminent, the private interests at stake are profound."); *Aleman Gonzalez v. Barr*, 955 F.3d 762, 772 (9th Cir. 2020), *rev'd on other grounds*, 142 S. Ct. 2057 (2022) (re-affirming that "the conclusion that detention always becomes prolonged at six months [is] consistent with the reasoning of *Zadvydas*, *Demore*, *Casas*, and *Diouf II*" (internal quotation marks omitted)).

Rodriguez Diaz had been detained for sixteen months and had gone more than fourteen months without a bond hearing when he filed this habeas petition. During this time, as provided under § 1226(a), the government never had the burden of showing that Rodriguez Diaz is a danger to the community or a flight risk.

Further, Rodriguez Diaz's liberty interest is particularly weighty because, while in detention, Rodriguez Diaz was held in Yuba County Jail, a facility that houses individuals convicted of crimes. During his detention, he did not have access to a cell phone or internet, was deprived of the ability

to freely interact with his family, friends, and counsel, and was unable to work to support his wife and child. The majority's point that immigration proceedings are civil proceedings, and therefore some procedures afforded to criminal defendants do not apply to detainees, **Majority Op. 30–31 n.7**, emphasizes the increased importance of other procedural protections in these circumstances, such as an additional bond hearing, when a detainee is "incarcerated under conditions indistinguishable from those imposed on criminal defendants sent to prison following convictions for violent felonies and other serious crimes." *Velasco Lopez*, 978 F.3d at 850.

Significantly, Rodriguez Diaz did not receive the procedural protections afforded to an individual in the criminal justice system before that individual is placed in similar conditions, including the right to counsel or a speedy trial. As *amici* argue, there is a stark contrast between the procedural protections afforded to clients in the criminal context versus those in the civil custody of ICE—including the burden of proof justifying such detention. *See id.* at 850 (holding that "the sum total of procedural protections afforded" to a detainee who was held under § 1226(a) "was far less" than a criminal defendant, even though the detainee's conditions of incarceration were nearly identical to those of a criminal defendant (internal quotation marks omitted)). Accordingly, this factor weighs heavily in Rodriguez Diaz's favor.

**B.**

The majority also undervalues the "risk of an erroneous deprivation of [Rodriguez Diaz's] interest[s] through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. The second prong of the *Mathews* test examines the

chance that, under the current procedures, the IJ will detain someone who does not actually pose a flight risk or danger to the community.

Under § 1226(a), a detainee is (1) not guaranteed a bond rehearing unless there are materially changed circumstances, and (2) if afforded a new bond hearing, the detainee still bears the burden of proof. 8 C.F.R. § 1003.19. In practice, an individual detained under § 1226(a) can be detained for the entire course of his immigration proceedings without an additional bond hearing, which can amount to an extremely lengthy period of time. *See Hernandez-Lara v. Lyons*, 10 F.4th 19, 29 (3d Cir. 2021) ("The exact length of detention under section 1226(a) is impossible to predict and can be quite lengthy"); *Velasco Lopez*, 978 F.3d at 852 ("Detention under § 1226(a) is frequently prolonged because it continues until all proceedings and appeals are concluded . . . . even where an individual has prevailed and the [g]overnment appeals.") ("[I]t is impossible to say how long [the detainee's] incarceration would have lasted" under § 1226(a)). An additional bond hearing as a matter of right once detention becomes prolonged can decrease the risk that the prolonged detainment is in error.

Indeed, that is the scenario that played out here: Once Rodriguez Diaz received the bond hearing with processes our constitution requires, he was released by the IJ on bond. Thus, in real life terms the risk that Rodriguez Diaz was erroneously deprived of his liberty interest was one hundred percent.[3] As *amici* aptly point out, "this Court does not need

---

[3] The majority's argument that there was no due process violation because "different procedures can produce different results" does not apply in these circumstances,

to speculate on whether the application of the incorrect standard may have affected the outcome of the bond hearing. The record here proves it."

The majority states that "we cannot simply count [Rodriguez Diaz's] months of detention," **Majority Op. 30**, because, among other things, he previously received a bond hearing. But the "potential length of detention under section 1226(a)" is highly "relevant to the weight of the liberty interest at stake." *Hernandez-Lara*, 10 F.4th at 30 n.4. Under the majority's premise, an individual could be

---

because irrespective of the standard of evidence that was applied, Rodriguez Diaz was entitled to an additional hearing once his detention became prolonged under the Due Process Clause. **Majority Op. 41**. Rodriguez Diaz experienced a deprivation of his liberty when he did not receive this additional hearing, regardless of whether "placing a 'clear and convincing' burden on the government was proper." *Id.* Once a hearing was provided for Rodriguez Diaz, the clear and convincing standard of evidence simply helped reduce "the risk of error inherent in the truthfinding process." *Mathews*, 424 U.S. at 344. Under the majority's approach, Rodriguez Diaz would not actually be entitled to "different procedures" (for example, a hearing after his detention became prolonged in which the preponderance of the evidence standard was applied), he would not be entitled to *any* procedures. The majority's claim that Rodriguez Diaz should have remained detained, even though when he was granted this hearing an immigration court found he should be released on bond, shows that the majority's definition of due process offers no real procedural protections here.

detained for years without any further guarantee of process. This is not what our Constitution affords.[4]

Even if a detainee were to be afforded a hearing as a matter of right after his detention became prolonged, the risk of erroneous deprivation is high if he must still carry the burden of proof. Placing the burden of proof on the detainee rather than the government can lead to a less complete factual record, because the person with the burden of proof is the one responsible for creating the record. The more complete a factual record, the more information the IJ has to base a conclusion on, and therefore the more likely it is that the IJ will make the correct decision.

As *amici* explain, detainees are in a much worse position to compile a complete and accurate factual record than the government is. For instance, detainees have limited access to phones, computers, and mail, making it harder for them to gather relevant documents including their official records, proof of community ties, and employment verification. Detainees often face cultural and language barriers, making it even more difficult to access relevant information. Further, detainees often do not have access to legal help in building their case. And because detainees do not have a

---

[4] And the majority's statement that Rodriguez Diaz "was not without process," **Majority Op. 29**, further disregards "the risk of error inherent in the current burden allocation" during an initial bond hearing. *Hernandez-Lara*, 10 F.4th at 32. An initial hearing "does little to change the risk of error," when in that hearing "the burden is always on the noncitizen." *Id.*

constitutional right to counsel, many indigent noncitizens enjoy no such privilege.[5]

While noncitizens lack access to legal, financial, and community resources key to obtaining evidence to fight for their freedom, the government has immediate access to detainees' immigration or criminal records, as well as the resources and time to compile such information. *See Velasco Lopez*, 978 F.3d at 853.

The risk of legal error becomes weightier with each passing day of detention, requiring more procedural protections. *Id.* ("[A]s the period of . . . confinement grows, so do the required procedural protections." (internal quotation marks omitted)). The current procedures under § 1226(a) create a high risk of judicial error and assign such risk to the individual detainee. Rodriguez Diaz's prior bond hearing does not diminish the serious deprivation of liberty he experienced or adequately address the insufficient procedural protections afforded to him under § 1226(a). Because an individual's liberty interest increases over time, this liberty interest, combined with the risk of legal error, continues to raise due process violations, which increase in severity the longer the individual is detained. As such, the

---

[5] Even in cases such as Rodriguez Diaz's, where the detainee is able to obtain legal counsel, the detainee still faces many significant challenges in preparing his legal case, including "the inadequate number of attorney-visitation rooms, lack of contact visits, unavailability of interpreters, lack of access to video-teleconferencing (VTC) and telephones, lack of confidentiality, prohibition on electronic devices, and arbitrary changes in rules regarding attorney visitation" at detention centers.

second *Mathews* factor weighs strongly in Rodriguez Diaz's favor.

**C.**

I agree with the majority that, under the third *Mathews* factor, there is a strong governmental interest at stake here, including ensuring noncitizens do not abscond or commit crimes while their removal proceedings are pending. However, our precedent does not suggest that the government's broad interest in controlling immigration supersedes an individual's interest in freedom from detention. Even considering the heavy weight that must be placed on the government's interest in the immigration context, *see Landon v. Plasencia*, 459 U.S. 21, 34 (1982), the liberty interest here is so great that it outweighs the government's interest once detention becomes prolonged.

Significantly, unlike the individual's interest in liberty, the strength of the government's interest remains constant over the course of an individual's detention. *See Velasco Lopez*, 978 F.3d at 855 ("[T]he longer detention continues, the greater the need for the [g]overnment to justify its continuation."). I disagree with the majority's reasoning that the government's interest increases over time because "the risk of a detainee absconding inevitably escalates as the time for removal becomes more imminent." **Majority Op. 32.** The case the majority cites to for this proposition, *Johnson v. Guzman Chavez*, 141 S. Ct. 2271 (2021), focuses on noncitizens detained under § 1231, a statute which applies when a noncitizen has already been ordered removed. *See id.* at 2290. *Johnson* in fact explains that noncitizens who have *not* been ordered removed, such as those detained under § 1226, "are less likely to abscond because they have a chance of being found admissible." *Id.* Rather, the government's interests in protecting the public and enforcing

our immigration laws remain consistent throughout a detainee's removal proceedings.

Moreover, the majority's analysis of the government's interest is flawed throughout by its presumption that the passing time would inevitably lead to Rodriguez Diaz's removal. The majority presumes Rodriguez Diaz will lose his appeal to the BIA and his petition for review to us. This is not a presumption in which we, as judges, should indulge.

In our analysis of the government's interest, we must also consider public interest issues such as "the administrative burden and other societal costs that would be associated with the additional process." *Velasco Lopez*, 978 F.3d at 855 (internal quotation marks omitted). This consideration favors Rodriguez Diaz because "[w]hen the [g]overnment incarcerates individuals it cannot show to be a poor bail risk for prolonged periods of time . . . it separates families and removes from the community breadwinners, caregivers, parents, siblings and employees." *Id.* Indeed, "limiting the use of detention to only those noncitizens who are dangerous or a flight risk may save the government, and therefore the public, from expending substantial resources on needless detention." *Hernandez-Lara,* 10 F.4th at 33. Rodriguez Diaz's case exemplifies this point: The IJ determined that Rodriguez Diaz was not a danger nor a flight risk when he was afforded a hearing with the constitutionally required procedural protections. Therefore, because his "unnecessary detention impose[d] substantial societal costs," the government's interest here supports affording Rodriguez Diaz an additional bond hearing. *Id.*

Lastly, as the district court indicated, the government's interest here "is the ability to detain [p]etitioner without providing him with another bond hearing, not whether the government may continue to detain him, and it is not

contested that the cost of conducting a bond hearing, to determine whether the continued detention of [p]etitioner is justified, is minimal." Accordingly, the government's interest here is outweighed by Rodriguez Diaz's fundamental liberty interest.

## IV.

In balancing the *Mathews* factors, I agree with the majority that at the start of a noncitizen's detainment, the government's interest initially outweighs the individual's interest. However, at a certain point, the individual's liberty interest begins to overshadow the government's interest, which remains constant. *See Velasco Lopez*, 978 F.3d at 855.

As the majority acknowledges, its decision is not mandated by precedent. The proper balancing of the *Mathews* factors under § 1226(a) is unsettled in our Circuit. Other circuits have weighed the competing interests and have come to different outcomes regarding the constitutionality of § 1226(a)'s procedures. *See id.* at 855–56; *Hernandez-Lara*, 10 F.4th at 41 (holding that "due process requires the government to either (1) prove by clear and convincing evidence that [the noncitizen] poses a danger to the community or (2) prove by a preponderance of the evidence that [the noncitizen] poses a flight risk"); *Borbot v. Warden Hudson Cty. Corr. Facility*, 906 F.3d 274, 280 (3d Cir. 2018) (recognizing that "despite an initial bond hearing, detention under § 1226(a) might become unreasonably prolonged," but concluding that the petitioner "fail[ed] to identify a basis in the record to demonstrate that this is such a case"); *Miranda v. Garland*, 34 F.4th 338, 366 (4th Cir. 2022) (a divided panel that agreed "with the Third Circuit's view of the burden of proof procedures in § 1226(a)" while "regoniz[ing] that [its] decision conflicts with decisions

from two of [its] sister circuits," over a dissent by Judge Urbanski).[6]

The majority chose to follow the Third Circuit's approach, which held that the government's interest prevailed. *See Borbot*, 906 F.3d at 280.[7]  However, in *Velasco Lopez*, the Second Circuit explained that the government must bear the burden of proof in § 1226(a) bond proceedings *after detention becomes prolonged,* because at that point, the individual's interest becomes greater than the government's interest, and therefore the risk of error should be placed on the party with the less weighty interest. *See* 978 F.3d at 855–56.

The Second Circuit more accurately weighs the important interests at stake than does the majority opinion. "While the [g]overnment's interest may have initially outweighed short-term deprivation of [Rodriguez Diaz's]

---

[6] "[D]isagree[ing] with the majority's conclusion that placing the burden of proof on the noncitizen at § 1226(a) bond hearings meets the requirements of *Mathews v. Eldridge*," Judge Urbanksi emphasized that, along with a handful of its sister circuit courts, "a growing chorus of" district courts "have held that due process requires the government to bear the burden of proving danger or flight risk at a § 1226(a) immigration bond hearing." *Id.* at 375–78 (Urbanksi, J., dissenting in part) (listing cases).

[7] It is worth noting that in a subsequent decision, the Third Circuit held that under § 1226(c), "the [g]overnment must justify [a detainee's] continued detention by clear and convincing evidence" once his detention becomes unreasonably prolonged to satisfy due process. *German Santos v. Warden Pike Cty. Corr. Facility*, 965 F.3d 203, 206 (3d Cir. 2020).

liberty interests . . . [his] prolonged incarceration, which had continued for [sixteen] months without an end in sight or a determination that he [continued to be] a danger or flight risk, violated due process." *Id.* at 854–55.

As the Second Circuit held, and the Supreme Court's precedent suggests, after an individual's detention becomes prolonged—often found to be at the six-month mark—the government is required to provide him with a bond hearing at which the government has the burden of proof under a clear and convincing standard of evidence. *See Diouf II*, 634 F.3d at 1092 n.13 ("[D]etention is prolonged when it has lasted six months . . ."). Although the majority acknowledges that we have held that detention becomes prolonged after exceeding the six-month mark, it fails to grapple with how our past decisions weigh into the liberty calculus when evaluating the *Mathews* factors.

Accordingly, in balancing the *Mathews* factors, the due process concepts embedded in the Supreme Court's and our precedent suggest that once an individual has been detained for six months, the government must provide a new bond hearing at which the government proves its interest in detention by clear and convincing evidence to meet the due process protections set out in the Constitution. *See, e.g., Addington*, 441 U.S. at 427; *Demore*, 538 U.S. at 529; *Singh*, 638 F.3d at 1203–04. Because Rodriguez Diaz had been detained for fourteen months since his first bond hearing, he was constitutionally entitled to another bond hearing in

which the government bore the burden of proof by a clear and convincing evidence standard.[8]

**V.**

"The Fifth Amendment says that '[n]o person shall be . . . deprived of life, liberty, or property without due process of law.' An alien is a 'person.' To hold him without bail is to deprive him of bodily 'liberty.'" *Jennings*, 138 S. Ct. at 861 (Breyer, J., dissenting) (citations omitted). Our precedent instructs that these Fifth Amendment procedural protections should be evaluated with even more scrutiny the longer an individual's liberty is deprived by the government. After six months, Rodriguez Diaz's liberty interest

---

[8] And the majority need not have concluded that six months is the amount of time in which detention becomes prolonged in order to have found Rodriguez Diaz's detention unconstitutional. Instead, it could have found that "[o]n any calculus, [Rodriguez Diaz's sixteen]-month incarceration without a determination that his continued incarceration was justified violated due process." *Velasco Lopez*, 978 F.3d at 855 n.13 (declining "to establish a bright-line rule for when due process entitles an individual detained under § 1226(a) to a new bond hearing with a shifted burden" but acknowledging that "[t]he Supreme Court has held that noncitizens who have been ordered removed for having committed serious criminal offenses or having a long criminal history cannot be detained indefinitely, and a presumptively constitutional period of detention does not exceed six months"); *see also Hernandez-Lara*, 10 F.4th at 25 n.2, 41 (declining to decide when detention becomes sufficiently prolonged, but similarly finding that there had been a due process violation after the detainee had been held for ten months without an additional bond hearing in which the government bore the burden of proof).

outweighed the government's interest, and the procedures afforded to him under § 1226(a) deprived him of his bodily liberty in violation of the Due Process Clause.

For the foregoing reasons, I respectfully dissent.